[Crim. No. 1018.   Third Appellate District.—June 15, 1928.]

THE PEOPLE, Respondent, v. ISABEL LE BARON, Appellant.

Edward Bickmore, Edwin V. McKenzie and J. H. Sapiro for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, Acting P. J.—By an information filed in the superior court of Merced County by the district attorney thereof the defendant was charged with violating the provisions of the "State Poisons Act," so called. (Stats. 1907, p. 124, as amended by the legislature of 1925—Stats. 1925, p. 137.)

The information, in two separate counts, accuses the defendant of the commission of two different offenses under said act, to wit: 1. Having in her possession cocaine, a poisonous drug; 2. Having in her possession morphine, also a poisonous drug.

The trial of the defendant upon said charges resulted in her conviction by the jury of each of said offenses.

She made and urged a motion for a new trial, which was denied. This appeal is prosecuted by her from the judgment of conviction and the order denying her motion for a new trial.

The points presented and vigorously pressed for a reversal are: 1. That the testimony relied upon by the People for a conviction—in fact, the only testimony, as is the claim, tending to support the allegations of the information was that of an accomplice of the accused in the alleged commission of the crimes charged, and that such accomplice's testimony was not corroborated by testimony independent of that of such accomplice in the manner prescribed by section 1111 of the Penal Code; 2. Erroneous rulings on the admission of certain testimony; 3. That neither count of the information states a public offense.

It appears that in the city of Merced there was a house known as the "Palace Rooming House" or "Palace Rooms." At this house, at the times connected with the present inquiry, transients could secure lodgings and, if desired, according to the testimony of the alleged accomplice, and which testimony is strongly corroborated by circumstances, a customer or lodger could secure the unsavory companionship for the night or even for a less permanent duration of time of a female abandoned to the lowest vices to which a human of that sex can descend. In other words, speaking plainly, and in perfect accord with the facts and circumstances developed through the evidence, while it is true that a person could secure a room at said house to be used solely for the purpose of rest, it is also true that the place was conducted as a house of assignation or prostitution. It further appears that in the months of May, June, and July, 1927, a woman known as May Howard, also known as "May Wilson," had said house under lease and owned the furniture that it then contained; that, during that time and down to July 14, 1927, said May Wilson, by which name we will hereinafter refer to that party, did not herself, or personally, manage or conduct said house; nor was she then about the premises very often, but that she employed a young woman, of the age of twenty-two years, and who was known as Dewie Dale, to manage the establishment for her (Wilson); that Miss Dale did manage the place during the months mentioned. The evi-

dence also discloses that, on the fourteenth day of July, 1927, the defendant purchased the leasehold interest of May Wilson in the premises and also all the furniture and household equipments it then contained. The defendant, it may here be stated, was the wife of a man by the name of McCracken, but who for some time and at all times referred to herein passed under the pseudonym of "Paul Le Baron." After and from the time the defendant took possession of the premises, Dewie Dale (now quoting from the statement of the facts as it is presented in the defendant's brief) "continued as an inmate of the house up to the time of the arrest of the defendant on July 30th, 1927; that the defendant and her husband, Paul Le Baron, had stopped at this house at divers times prior to the taking over of the lease by the defendant on July 14th, and were there twice for a day or two at a time after the last-mentioned date (Dewie Dale still being in charge for defendant), coming to Merced and stopping at said lodging house on the evening prior to the arrest of the defendant; that at the times the defendant and her husband were present in Merced after said July 14th, and particularly on the evening and night preceding the arrest of the defendant, said Dewie Dale, the defendant, and her husband occupied several of the front rooms of said lodging house and particularly jointly used a front corner room of the same." On the morning of the 30th of July, 1927, a controversy of an acrimonious nature arose at the "rooming house" between Dewie Dale, on the one side, and the defendant and her husband on the other, the origin thereof being differently explained by Dewie and the defendant. The quarrel having ended, Dewie Dale by telephone called the chief of police and informed the party answering the call that the defendant had concealed in the house a quantity of narcotics. Two police officers shortly thereafter appeared at the house and within a few minutes subsequently and while the Dale woman was telling said officers of the alleged fact of the possession of the narcotics by the defendant, the chief of police, Wayne Westfall, also appeared at the house. Miss Dale repeated to the chief the charge against the defendant, and at the same time led that officer into the lavatory or "toilet," as she expressed it, and reaching through an aperture in the ceiling

brought out and delivered to the chief two cans containing morphine and a package containing cocaine. When the chief of police entered the rooming-house the defendant was present. She heard the charge laid against her before the chief by Dewie Dale; but she denied having possession of the drugs and declared that she did not know until then that there were any such articles in the house, and had no knowledge of how or by whom the narcotics were placed above the ceiling of the toilet. The two women were placed under arrest by the chief and taken to jail, where they were incarcerated. Charges of unlawful possession of poisonous drugs were filed before a magistrate against both women, and, upon a preliminary examination of the charges, both were held for trial in the superior court for said offenses, and there a separate information, based upon the magistrate's commitment, was filed against each. At the time of the trial of the defendant, Dewie Dale had not been brought to trial. Paul Le Baron was at the rooming-house at the time the Dale women telephoned for the officers, but he left the premises either before or immediately upon the arrival of the officer (the record is not clear as to this), and, so far as the present record discloses, has not been seen or heard of since the date of the arrest of the two women.

At the trial of the defendant the chief of police testified to the facts embraced within the above general statement, in so far as was concerned his connection with the occurrences at the rooming-house after he appeared there. The chief further testified: That, in addition to the narcotics, the Dale woman also took from the ceiling of the toilet and delivered to him a package containing "little rubber tubes," "some little glass vials," a catheter, etc.; that, about an hour after the women were confined in jail, he, with Dewie Dale, returned to the rooming-house, the latter having told him at the jail that there were some other articles at the house belonging to the narcotic equipment. Dale, on that occasion, after looking about the house for a time, found in the drawer of the phonograph stand a box containing "hypodermic needles," and passed the box and its contents over to the chief. The latter further testified that Dale delivered to him as a part of the "drug outfit" a small syringe. The witness was not certain

whether that instrument was taken by the Dale woman from the place over the ceiling from which she obtained the cases of morphine and the cocaine package and at that time delivered to him, or was found and delivered to him by her on their return to the house after she had been taken to jail. He was positive, though, that the syringe was found and delivered to him by Dewie on the one or other of those occasions. The chief testified that the phonograph stand referred to was in the room which defendant stated to him that she and her husband occupied. He further testified that at the time of the arrest, and while he was still at the rooming-house, the Dale woman stated to him that, while she had on two or three occasions used cocaine, she was not a "drug addict."

Dewie Dale, testifying for the People, stated: That on the 30th of July, 1927, she was engaged in the business of prostitution at the "Palace Hotel" in Merced, and that the defendant at the same time and place was engaged in the same business. (This testimony was received without objection, and no motion to strike it from the record was made by defendant's counsel or by defendant herself.) Continuing, the witness said: That she placed the cases and the package of cocaine "in the attic" (as she termed it) of the toilet, "punching a hole through the ceiling for that purpose, by the direction of Paul Le Baron, given in the presence of the defendant; that one of the cans was so concealed within the last two weeks of June, 1927, and the second can, by his direction, placed in the same place about two or three weeks after putting the first can there; that the "little rubbers" and glass vials were, by direction of Le Baron, by her put in the same place, wrapped in a separate package, as was also the cocaine. The can of morphine last placed in the ceiling of the toilet, she said, was given to her by Paul Le Baron about half an hour after he and defendant arrived at the house from San Francisco; that Le Baron "took it from his bag"; that "he (Le Baron) said: 'Dewie, take this can and put it in the plant with the other' "; that, as Dewie took the can, Le Baron said to her: "Just wait a minute; I have something else"; "So," continued Dewie, "he went through his bag and started to look for the cocaine, and he could not find it, and so Isabel says: 'Just a minute; I will get

it for you,' and she (defendant) went to his bag and got his bathrobe and went in the pocket and took out the blue package of cocaine, and she handed it to me, and when she handed me that morphine, I put it in the plant, in the hiding place. Q. By district attorney: Is Paul Le Baron an addict? A. He is. Q. Is Isabel an addict? A. She is. Q. Do you know approximately the amount used by either of them, the amount of morphine? A. Well, I don't know to the grain, but I know just about how much of a cube they use. . . . Well, Isabel uses, I think, a little less than Paul, but not very much less—I would say a quarter of a tube less. Q. How does she (defendant) use it? A. With a hypodermic.'' Witness explained how the syringe found in the room of defendant and the hypodermic needles were used by a narcotic addict for the purpose of self-injection of the narcotics, and stated that she had seen the defendant use those articles when injecting morphine or cocaine into her body. The witness testified that Le Baron stated to her, in the presence of the defendant, that he had acquired the leasehold interest of May Wilson in the premises and also had purchased from the same party the furniture and household equipment in the house, and that the house was to be under the charge and management of the defendant; that she (Dewie Dale) could remain at the house and conduct the same until the defendant (his wife) had so far recovered her health as to enable her to take personal charge and management thereof; that she (witness) did remain at the house and in control and paid to the defendant any moneys she received for the renting of rooms. At the time of the arrest (the witness stated) the defendant was in active charge of the house. Dewie Dale, on cross-examination, stated that the narcotics referred to herein were placed in the "hiding place" in the house by her while May Wilson was owner of the "Palace Rooms" or "Palace Hotel," as sometimes the premises in question were called by the witnesses. May Wilson herself was not at the house at any time while she owned it, but Dewie, as explained above, was managing the place for Wilson. In this connection it is proper to state that the defendant testified that both she and her husband stopped at the rooming-house several times in the month of June, 1927. The Dale woman testified that on

two of such visits she "planted," or concealed in the house, at the request of Paul Le Baron, the narcotics which she delivered to the chief of police on the 30th of July.

The defendant testified that she had known Paul Mc-Cracken, or Le Baron, for about six years prior to the time of the trial of this case, and that, about a year prior to the trial, she and Paul intermarried in Jackson County, Oregon. She testified that she and her husband had been occasional visitors to the Palace Rooming House and visited the house in the month of June, 1927; she admitted that she acquired from May Wilson the latter's leasehold in the premises and also purchased the furniture in the house and took possession thereof on the 14th of July, 1927, but that a written transfer was not executed until the twenty-seventh day of July of that year; that she was not in good health at the times referred to and for that reason she employed Dewie Dale, who had been conducting the place for May Wilson, to take charge of the place and manage it until she (defendant) was herself able to do so. She stated that she first met Dewie Dale at a roadhouse near Sacramento city on September 17, 1926, at which road-house Dewie was employed, and that she again met her in January, 1927, at her (defendant's) house in Los Angeles; that she became interested in the proposition of taking over the Merced rooming-house through the suggestion of Dewie Dale. Defendant, in reply to questions by her own attorney, stated that her husband (Paul Le Baron) was "what is known as a drug addict," and that she herself was in the habit of taking morphine once a week. In assumed mitigation of this habit of herself and husband, she explained that both took the narcotics because of "ill health"; that, as to herself, she used the morphine by the advice of her physician for the purpose of relieving herself from the bodily pains incident to her ill health or the disease, whatever its specific nature was, from which she was and had for a year been a sufferer. She in effect admitted that she was a prostitute, a proposition as to which further consideration will be required when we take up for determination the point involving an attack on certain rulings as to the admissibility of certain testimony and upon which a demand for reversal is predicated.

The foregoing synoptical statement of the testimony is sufficient for the purpose of considering the point first made by the defendant for a reversal, to wit: That the testimony of Dewie Dale, who, it is claimed, was an accomplice of the defendant in the commission of the offenses charged in the information, was not corroborated as the law declares is indispensable to the support of a conviction, where such accomplice's testimony is the only testimony directly connecting the accused with the commission of the offense charged. In considering this question, we are not to be understood as deciding that Dewie Dale, under the evidence presented by the record before us and under the statute upon which the information herein is founded, is an accomplice. Nor is it to be understood that we here intend to hold that she was not such accomplice. (See latter clause of sec. 1111, Pen. Code.) We may and will assume, however, for the purposes of the decision herein, that she was an accomplice of the accused in the commission of the offenses of which the latter was convicted.

As to the *quantum* and the quality of proof essential to the corroboration of the testimony of an accomplice to justify, legally, a conviction of the accused upon such testimony, section 1111 of the Penal Code provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

It will be noticed that the language of the foregoing section is, in substance, that the corroborating testimony is sufficient if it *tends* to connect the defendant with the commission of the offense, and the courts of this and of many, if not all, of the other state jurisdictions, in construing that language, have uniformly held that if the corroborating evidence of itself *tends* so to connect the defendant, it sufficiently measures up to the requirements of the section, even though it be slight, "and entitled, when standing alone, to but little consideration." (*People* v. *McLean*, 84 Cal. 480, 482 [24 Pac. 32]; see, also, *People* v. *Melvane*, 39 Cal. 616). "If," says the court, in *People* v. *Blunkall*, 31 Cal. App. 778, 783 [161 Pac. 997, 999], "there be some independent evi-

dence fairly *tending* to connect the defendant with the commission of the crime, then the testimony of the accomplice is corroborated within the intent of the above section. (*People* v. *Garnett,* 29 Cal. 662; *People* v. *Clough,* 73 Cal. 348 [15 Pac. 5]; *People* v. *Miller,* 65 Iowa, 60 [21 N. W. 181]; *People* v. *Mayhew,* 150 N. Y. 346 [44 N. E. 971].)''

█ It seems to us very clear that the reading of the evidence, as in conspectus form it has hereinabove been reproduced, cannot leave in the mind of one free from a partisan interest in the case any doubt that there are facts and circumstances brought out by evidence independent of the testimony of Dewie Dale which in probative effect extend beyond that *quantum* of proof which merely tends to connect the accused with the commission of the offenses with which the information charges her. Indeed, the facts and circumstances referred to were in part brought into the record by the defendant's own admissions and are these: 1. That the defendant and her husband visited and temporarily stopped at the rooming-house on several different occasions in the middle part of the month of June, 1927, and also several different times in the month of July, prior to the fourteenth day of that month, on which date the defendant took possession of the premises under the lease transferred to her by May Wilson; 2. That, from and including the last named date she held possession of the house and through Dewie Dale, her agent, managed the business conducted thereat, until a few days prior to the 30th of July, when, as she admitted to the chief of police, she was herself in personal charge of the place; 3. That her husband was a drug addict, or, as that phrase really means, an habitual or confirmed user of narcotics, and that she herself, though denying that she was a "drug addict," used morphine once a week; 4. That (the chief of police testified) when Dewie Dale returned to the house with that officer, after her arrest, to look for and deliver to him, if she found them, certain articles which are necessary to be used where opiates are hypodermically administered, she searched several different rooms in the house and several different places in the rooms before she was able to locate any such articles, and finally found a number of "hypodermic needles" in the drawer of the phonograph stand, which was then in the room occupied by the defendant

and her husband, a circumstance reasonably affording the inference that the needles were placed where found by someone other than the witness, otherwise the latter would have known their precise location and not have been required to search the several rooms in the house to locate them; 5. The undisputed fact that the narcotics were secreted in the toilet in the bathroom which was directly connected with the room occupied by the defendant and her husband on every occasion that they visited and stopped at the house. These circumstances were more than sufficient to meet the requirement of section 1111 of the Penal Code as to the corroboration of the testimony of an accomplice. Indeed, we feel no reluctance in saying that upon those circumstances alone, or without regard to the testimony of Dewie Dale, the jury could, as they did, predicate an impregnable verdict of guilty. Of course, the jury were not bound by the testimony of the defendant denying knowledge of the fact that the narcotics were concealed in her house until the time of the arrest of herself and Dewie Dale. They were the exclusive judges of the question of the credibility of her testimony. It can readily be perceived how the jury could have concluded from all the circumstances of the case that the narcotics were secreted and kept in the house for her own as well as for the convenient use of her husband, admittedly a slave to the drug habit. It is known as a matter of common knowledge that a confirmed user of opium, morphine, cocaine, and other like opiates, must at all times keep his system of nerve fibers maintained to a certain condition of stimulation, and that when the effects of the poison are disappearing, will develop a state of desperation unless the poisonous drug is immediately accessible to him. This proposition is, indeed, so generally known and understood that it would be absurd to say that the courts and juries may not take notice thereof and apply it where necessary in the determination of an issue such as is presented here. But this discussion need not further be pursued. As before stated, it is perfectly clear, as it has been our sole purpose to point out in the foregoing consideration of the evidence, that in any event there is sufficient evidence, apart from or independent of the testimony of Dewie Dale, to support the verdict, and that, therefore, if Dewie Dale was an accom-

plice of the accused, such independent evidence more than measures up to the requirement of the law as to the *quantum* of corroborating evidence necessary in such instances.

It may well here be suggested, in order to meet any argument which might be offered upon the proposition, that even if the defendant herself was not a drug addict (a matter for the jury to determine, notwithstanding her positive denial that she was) but held possession of the drugs for use by her husband or by Dewie Dale or for both, that fact would not constitute a legal defense to the charges alleged against her. Nor would it be a defense to said charges if it appeared that the possession was joint—that is, if the drugs were kept in the house to be used by herself, her husband, and Dewie Dale. In that case each would equally be subject to punishment for such unlawful possession. This proposition, though, is so clearly a commonplace that the citation of cases to support it is entirely unnecessary, yet, it may not be wholly amiss to state that precisely the same proposition is suggested in the case of the *People* v. *Hay,* 74 Cal. App. 464, 472. [241 Pac. 275].

The second point, as above declared, is founded on rulings admitting certain testimony which, it is claimed, resulted in seriously prejudicing the accused in the minds of the jury. On cross-examination, the district attorney examined the defendant as follows: "Q. What is your occupation? A. I have none. Q. Haven't you been practicing prostitution? A. No, sir, not for one year, my health would not permit it. Q. You have not practiced prostitution nor been in a house of prostitution for one year? A. I have been in a house of prostitution, but I have not practiced it. Q. You were not working? A. I was not working, no sir. Q. Weren't you working here for May Wilson? A. No, sir. Q. Never? A. No, sir." There were no objections interposed by the defendant's counsel to those questions.

The district attorney, assuming (upon what theory or for what purpose we have been unable to discern) that it was not only legally proper but important to show, if he could, that the defendant had practiced prostitution within the year during which she stated that her health was such as to prevent her from actually engaging in that business,

asked her on cross-examination if she had not "worked" during said period of time in several different houses of ill-fame in the city of Los Angeles. There were no objections made by the defendant's counsel to those questions. The prosecutor then asked defendant whether, on the night of the 9th of August, 1927, she was "entertaining" a "man" in her apartment at 355 Fulton Street, San Francisco, when a detective entered the apartment looking for Paul Le Baron, and that the "man" then said to the detective, in the presence of the defendant, that "he had picked you (defendant) up on the street and paid you (defendant) $14.00, or some such sum." Counsel for the accused did object to that question and assigned the asking of the question as misconduct on the part of the prosecutor. The defendant admitted that within the year preceding the time of the trial of this case she was in several houses of prostitution in the city of Los Angeles referred to by the prosecutor, but denied that during that time, or while in said houses, she actually practiced prostitution. As to the San Francisco episode, she positively denied that any such transaction occurred.

In rebuttal, the prosecutor introduced as a witness one A. J. Kane, the head of a San Francisco detective agency, who testified, in response to questions by the district attorney, that on the night of the 9th of August, 1927, he went to the apartment of the defendant at 355 Fulton Street, in San Francisco, to look for and arrest Paul Le Baron; that upon entering the apartment, he saw a man in a room therein partly undressed and engaged in putting his clothes on; that he asked the man if he was McCracken (or Le Baron), and defendant interposed, saying, "he (the 'man') is my uncle," to which the "man" replied: "Uncle, hell! I am not; I paid her $14.00 to stay here all night." To that testimony the defendant made no objection. It should be explained, however, that after the detective had stated his purpose in visiting the defendant's apartment, to wit: to arrest Le Baron "for Merced County," counsel for the defendant objected to the testimony as "irrelevant, immaterial and incompetent"; but, upon the statement by the court that, while the defendant could not be impeached by testimony of particular acts, the testimony proposed, as explained by the prosecutor, was nevertheless admissible for

the purpose of contradicting defendant's testimony that she was not then practicing prostitution or engaged in that business, as affecting the credibility of her testimony, counsel for the defendant acquiesced in that view of the law and made no further objections to the detective's testimony. The result was that the latter's testimony about seeing a man, not fully attired, in defendant's room, and of what the man stated was the occasion or reason for his presence there, went before the jury without objection. And so throughout the trial, as the record discloses, counsel for the defendant, from the nature of his objections, appears to have assumed that it was legally proper for the People to bring before the jury in a competent way any fact or circumstance which would tend to show that his client was not only a prostitute but that she had practiced prostitution continuously down to the date of her arrest for the offenses with which the information charges her, upon the theory that such testimony went to the impeachment of her testimony that she had not actually followed her sordid vocation during the course of the year immediately preceding the date of trial.

The cross-examination of the defendant by the district attorney looking to the development of the fact before the jury that the accused was a prostitute was manifestly erroneous and should not have been permitted. (*People* v. *Un Dong,* 106 Cal. 83, 87, 88 [39 Pac. 12]; *People* v. *Crandall,* 125 Cal. 129, 134 et seq. [57 Pac. 785]; *People* v. *Vatek,* 71 Cal. App. 453, 468 [236 Pac. 163].) In *People* v. *Un Dong, supra,* the defendant (on trial for the crime of assault with a deadly weapon alleged to have been committed on a public street in the Chinese quarters of San Jose) and an associate, one Ah Wei, lay in wait in the night-time for the prosecuting witness, one Ah Bong, to appear upon the street from a restaurant where he was known by defendant to be at the time, and when, finally, Ah Bong made his appearance upon the street the defendant told Ah Wei to shoot; that the latter thereupon fired two shots at Ah Bong, one of which hit him in the back. In cross-examining the defendant, the district attorney asked him, among other questions, if it was not true that the house he resided in was a house of prostitution. Objection by the defense to that question was overruled,

and the defendant answered in the negative. Other like questions were asked, objected to, the objection overruled and the defendant answered in the negative. In reply to the argument of the attorney-general that the negative answers of the defendant to the questions allowed had the effect of curing the error, or any prejudice to the rights of the defendant which affirmative answers might have produced, the court, after characterizing the cross-examination as "improper in the highest degree," said: "The error in such case lies in permitting an examination of that character," citing *People* v. *Wells*, 100 Cal. 459 [34 Pac. 1078]. The rule as thus laid down is proper to invoke in all cases in which the testimony sought to be elicited by the indicated cross-examination has no possible connection with the issue under trial. Indeed, such a cross-examination in any case, unless it is one in which the accused is charged with some sex offense to which such an inquiry would or might be directly pertinent, is improper, so much so that the mere asking of questions along those lines, even if answers thereto were disallowed, would itself be highly prejudicial to the accused, because of the insinuation with which necessarily they are pregnant that the defendant is or has been guilty of living a life characterized by the worst kind of moral depravity, an insinuation which would be likely to find lodgment in the minds of the jury so that they, maybe unconsciously, would or might be more or less influenced against the accused, even in cases where, as the court stated was true in the case of Un Dong, *supra,* there was unsatisfactory competent proof of the defendant's guilt. In the present case, however, while we do not approve of the cross-examination of the defendant by the district attorney along the lines indicated, the situation with respect to such cross-examination is peculiar and entirely different from that found in any of the cases where a like cross-examination was prosecuted under the approval of the trial court and of which the cases above cited are exemplars. The fact that the place where the narcotics were kept and found was a house of prostitution was first brought out in the direct examination of Dewie Dale by the district attorney, and the further fact that both the Dale woman and the defendant were prostitutes was likewise shown. Naturally, the defendant's counsel did not object to Dewie Dale's

testimony admitting that she was and had been engaged in the house where the narcotics were secreted and found in the business of prostitution, but counsel did not, as he should have done, object to that witness' testimony that the defendant was a prostitute. The only objection made by counsel in connection with the part of Dewie Dale's testimony describing the character of the house and stating that both she and the defendant were prostitutes was to the following question to that witness by the prosecutor: "What connection did Paul Le Baron have with that place?" referring to the Palace rooming-house. The objection to that question by counsel for the accused was that it called "for a conclusion of the witness." Later, and in the direct examination of Dewie Dale, the district attorney brought from the witness the statement that both she and the defendant were "girls" of Paul Le Baron—that is, that he practically lived with both of the women. Then the prosecutor asked: "You were both his girls, and you were working under him?" Objection here was made by counsel for the defendant upon the ground that the relationship of the women to Le Baron was foreign to the issues and assigned the asking of the question as misconduct. The district attorney stated, in an attempt to support the competency of the question, that its purpose was to bring out ultimately the fact that the defendant was in personal charge of the house when the narcotics were delivered to the chief of police. A colloquy followed between court and counsel and finally the attorney for the defendant stated that the latter had admitted that she was in charge of the house at the time mentioned, and "that ought to be sufficient." Thus that particular matter ended.

It will thus be seen that, as above stated, counsel for the defendant, in the trial of the case, from its beginning to its conclusion, appears to have been of the opinion that the malodorous character of the business maintained in the "rooming" house as well as the bad personal character of the defendant was a legitimate subject of inquiry in the case. Allowing all that testimony to go before jury without objection clearly supports that conclusion, and as clearly does it place the defendant before this court in a position in which consistently or logically or legally she cannot ask for a reversal of the case because the testimony

referred to thus became a part of the record upon which the jury were to decide the question of her guilt or innocence. It may here well be repeated that the verdict is more than satisfactorily supported by competent evidence, otherwise a different situation—such as the court said appeared in the case of *People* v. *Un Dong, supra*—might be presented here.

Defendant emphasizes the proposition that timely objection was made in her behalf against a certain letter introduced in evidence by the district attorney by way of rebuttal. The record shows that Dewie Dale stated in her direct examination that she was in love with Paul Le Baron, and that she had frequently had sexual relations with him, not only with the knowledge but with the express approval of the defendant. On cross-examination, and upon the theory that it affected the credibility of her testimony, the defendant's counsel asked Miss Dale if the motive prompting her to cause the arrest of the defendant was jealousy of the latter's relations with Paul Le Baron. The witness replied in the negative, but declared that she caused the arrest of defendant because Le Baron had the day previously severely beaten her about the face and body, had threatened to kill her, and that defendant had encouraged Paul to beat her and also stated that he (Paul) ought to "bump her off," meaning that he ought to kill her. Under the guise of rebuttal and upon the assumption that he had a right to show that jealousy was not the reason Miss Dale caused defendant to be arrested, the district attorney offered in evidence a letter (referred to above) written by the defendant at Los Angeles under the date of May 23, 1927, and addressed to Dewie Dale, at Merced, in which defendant, addressing Dewie in endearing terms, gave a graphic account of the trip of herself and Paul Le Baron in an automobile to Los Angeles, gave a somewhat vivid description of the harrowing details of a physical combat which Paul had had with an unnamed drunken Mexican who, it seems, had been traveling with them, told of the narrow escape of Paul from death at the hands of the Mexican, of how valiantly Paul fought the "crazy Mexican" and the skill with which he successfully defended both himself and defendant against

injury, and concluded by saying that if Dewie had only been present and had witnessed the fight she would now not only love and respect Paul, as she always had, but that she would "worship him." This is the substance of the contents of the letter. There was no necessity for introducing the letter in evidence, even if it were to be conceded that it was competent evidence for the purpose for which it was offered. Miss Dale, while denying that jealousy was her motive in causing the arrest of the defendant, admitted that she had a personal motive in exposing to the officers defendant's possession of the narcotics. All that the defendant needed or cared to show was that Miss Dale was interested in the success of the People's case for personal reasons. This shown, it could make no difference what the specific motive was, for, whatever it might have been, there was thus created an opening for the argument by defendant that she might, in her zeal for revenge against the latter, stray from the path of truth when giving her testimony to the jury. But, admitting that it was error to allow the letter to be received in evidence, there are substantial reasons arising from the record itself for holding that the case should not be remanded for such error, and they are these: 1. All that can be gathered from the letter (and this by construction or implication) is what Dewie Dale testified to without objection on her direct examination, viz.: That she loved Le Baron and that she sustained immoral relations with him with the approval or acquiescence of the defendant; 2. That (also by construction or implication) the defendant, as without objection she testified, was a "professional" prostitute. It is perfectly clear that any testimony that she was engaged in that unholy business received after she herself admitted on the witness-stand and, after Dewie Dale, without objection, testified, that her business was that of a prostitute could not have intensified the harm, if any, which had already been done in that respect under the circumstances as fully explained above.

The last point (and in regular order it should have been the first to be considered) to which attention is invited is that the information fails to state the offenses therein sought to be charged because the defendant is not

thereby charged with "wilfully, unlawfully and feloniously having narcotics in her possession." This contention means that, to state the crime set forth in the information, it is necessary to allege that the accused committed the acts constituting said crimes with the *intent* to do so. The contention is devoid of merit. The statute defining the offenses charged against the defendant does not declare that either intent or *scienter* is an ingredient thereof. It provides that the mere possession of the narcotics named in the information shall subject the possessor to the penalties prescribed therein. The rule of criminal pleading applying to cases of the character of the one here is exhaustively considered in the case of *People* v. *O'Brien,* 96 Cal. 171, 176 et seq. [31 Pac. 45, 47], and many authorities are cited, agreeing that "when an act, in general terms, is made indictable, a criminal intent need not be shown, unless from the language or effects of the law a purpose to require the existence of such intent can be discovered," citing *Halsted* v. *State,* 41 N. J. L. 552 [32 Am. Rep. 247]. It is further declared in the O'Brien case: "The same principle is applied to many cases, such as selling intoxicating liquors to minors, abducting girls under a certain age, usurping an office under the belief that the usurper was truly elected, illegal voting under the belief that the voter is a qualified elector, publishing a libel in ignorance of its contents, storing gunpowder, and the like. (1 Wharton's Crim. Law, sec. 88; 2 Wharton's Crim. Law, sec. 1584; *Hill* v. *State,* 62 Ala. 170.)"

To the same effect are the cases of *People* v. *Hartman,* 130 Cal. 487 [62 Pac. 823]; *People* v. *Pera,* 36 Cal. App. 292, 304 [171 Pac. 1091]; *Commonwealh* v. *Weiss,* 139 Pa. St. 251 [23 Am. St. Rep. 182, 11 L. R. A. 530, 21 Atl. 10]; *State* v. *Gould,* 40 Iowa, 374; *Commonwealth* v. *Holstein,* 132 Pa. St. 357 [19 Atl. 273]; *Rex* v. *Ogden,* 6 Car. & P. (Eng.) 611. (See, also, Pen. Code, sec. 7.)

We may add that if the defendant in a case, like the one here, is prosecuted under the State Poison Act, and his possession of any of the narcotics falling under the condemnation of the statute is upon the prescription of a physician given in good faith or for purely medicinal purposes, he may shield himself against punishment by exhibiting the prescription and so proving the fact that

such possession was lawful. (*People v. O'Brien, supra.*) No such proof was offered in the present case.

The judgment and the order are affirmed.

Plummer, J., and Bartlett, J., *pro tem.*, concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on July 14, 1928, and the following opinion then rendered thereon:

THE COURT.—The defendant petitions for a rehearing of the above-entitled cause and states that in its original opinion this court misapprehended the testimony in certain particulars. The petition states that there is not any testimony showing that Dewie Dale found the hypodermic needles in a room occupied by the defendant and her husband alone. The record clearly shows that the chief of police stated that the hypodermic needles were found in a room which the defendant said was occupied by her. (Tr., pp. 9 and 10.) It is true that the defendant stated that the same room had been occupied part of the time by Dewie Dale. But the defendant herself admitted that when she was at the house she occupied said room. The fact that Dewie Dale occasionally occupied the room does not militate in the least against any inference to be drawn from the fact that the defendant and her husband occupied said room whenever they were at the house.

The defendant also states that the toilet in which the narcotics were found was not connected directly with the room above referred to, but was connected with the room at the "other" end of the hallway. The testimony is not clear upon this proposition; but it is of little importance when compared with all the circumstances of the case taken together.

We do not propose to go over the petition for a rehearing in detail. It merely repeats the argument made in the original briefs. We are satisfied that the testimony and the circumstances developed thereby go beyond the mere corroboration of the testimony of Dewie Dale as required by the statute, and that the jury were well warranted in finding from all the circumstances that the defendant and her husband had possession of the narcotics referred to. As stated in the original opinion, it might be true that the

possession of the narcotics was joint—that is, jointly held by defendant, her husband and Dewie Dale for their purposes. As likewise stated, however, that fact would not be a defense in the case of the defendant. On all other points, we adhere to the conclusions announced in the original opinion.

The petition for a rehearing is denied.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 13, 1928.

All the Justices present concurred.