YANKWICH, J., pro tem.
In three complaints the five defendants were charged with the violation of two sections *764 of what is known as the Los Angeles city “anti-picketing” ordinance (Ord. No. 20,586 N. S.). The first count of each of these complaints charged violation of section 1 through the making of loud and unusual noises for the purpose of inducing, influencing and attempting to induce and influence, persons to refrain from entering the Rialto Theater at 812 South Broadway, in the city of Los Angeles. Defendants Thomas W. Armentrout, Joseph P. Dufrane, and James Doyle are charged with the commission of the offense on December 3, 1930. (No. 19,535.) In another complaint, Ernest Apae and Joe Hough are charged with the commission of the offense on December 4, 1930. (No. 19,537.) In a third complaint, Joe Hough and James Doyle are charged with the commission of the offense on December 11, 1930. (No. 19,735.) As to the second count which charged loitering and picketing, the trial court granted a new trial. The defendants were found guilty by a jury and judgment was pronounced by the court on March 24, 1931. The defendant Armentrout was fined two hundred and fifty ($250) dollars; Dufrane was fined fifty ($50) dollars; the others were fined twenty-five dollars ($25), upon count I of the complaint.. As to count II‘the trial court granted a new trial.
The determination of the sufficiency of the evidence to sustain the conviction requires a discussion of section 1 of the anti-picketing ordinance under which the prosecution was had. Before doing so, however, it is well to state briefly that the defendant Armentrout was the assistant business manager of the Projectionists’ Union, consisting of motion picture machine operators. The union was engaged in a controversy with the proprietor of the Rialto Theater, who had locked out the members of the union, whom he had previously employed. For several weeks prior to the dates covered by the complaints, newsboys had been stationed by Dufrane, acting as circulation manager, upon tike street at the north and south property lines of the theater to sell copies of the “Los Angeles Citizen”, a newspaper of general circulation, published by the labor movement in Los Angeles, and to cry the headlines of the newspaper. On November 28, 1930, the editor of the newspaper issued, at the request of T. H. Eckerson, business manager of the union, a .special edition of 500 'copies which con *765 tained all the material published in the regular edition except that the front page had been changed by printing thereon in large type headlines: “Trade unionists and their families and friends will need no further information to have them decide that they do not patronize the Rialto Theatre because it is on the unfair list of organized labor. By T.‘ H. Eckerson, business representative of the Moving Picture Projectionists Union No. 150.” The front page also carried a banner line in large type: “Rialto, Br.oadway are yet on the unfair list.” On page three of this edition was the article relating to the controversy which appeared also in the regular edition.
For crying out loud certain words claimed to be the headlines of this special edition the prosecution was instituted. And it is the contention of the defendants that they were merely selling newspapers, and that, assuming they were making loud and unusual noises in so doing, these were not unusual, but such as are made by newsboys everywhere, and are clearly recognized and legalized by the exception to what is known as the “ballyhoo” or street advertising ordinance of the city of Los Angeles (Ord. No. 6859 N. S.).
In passing upon this contention it is well to consider the anti-picketing ordinance in the light of certain rights of laboring men which are recognized by law, and the right of every citizen to speak freely in peace time, without being subjected to legislative or administrative restrictions, not covered by the law of libel, contempt, and/or regulatory measures passed pursuant to the police power. Section 1 of the ordinance reads:
“It shall be unlawful for any person, in or upon any public street, alley or public place in the city of Los Angeles, to make any loud or unusual noise, or to speak in a loud or unusual tone, or to cry out or proclaim, for the purposes of inducing or influencing, or attempting to induce or influence, any person to refrain from entering any works or factory or any place of business or employment, or for the purpose of inducing or influencing, or attempting to induce or influence, any person to refrain from purchasing or using any goods, wares, merchandise or other article or articles, or for the purpose of inducing or influencing, or attempting to induce or influence, any person to refrain *766 from doing or performing any service or labor in any works, factory, place of business or employment, or for the purpose of intimidating, threatening or coercing any person who is performing, seeking or obtaining service or labor in any works, factory, place of business or employment.”
The ordinance' has been declared a valid exercise of the police power. (Matter of Williams, 158 Cal. 550 [111 Pac. 1035].) Similar ordinances have been upheld elsewhere. (Thomas v. Indianapolis, 195 Ind. 440 [35 A. L. R. 1194, 45 N. E. 550]; Ex parte Stout, 82 Tex. Cr. Rep. 183 [L. R. A. 1918C, 277, 198 S. W. 967]; Watters v. Indianapolis, 191 Ind. 671 [134 N. E. 482 ]; see note, “The boycott as a weapon in industrial dispute,” 6 A. L. R. 909; 16 A. L. R. 230; 27 A. L. R. 651.)
In interpreting the ordinance it is well to bear in mind that courts have recognized the right of workmen engaged in industrial disputes to appeal to others in sympathy xvith their cause by spreading the news of this dispute. Whatever be the loss the employer may suffer from the social pressure resulting from this appeal, he cannot complain. (16 R. C. L. 457.) To make this appeal effective the workingman may—as it has been pithily put in one case—“hire a hall or print a paper”.
Some expressions of these principles are here given:
‘‘After striking, the employees may engage in a boycott, as that word is here employed. As here employed it means not only the right to the concerted withdrawal of social and business intercourse, but the right by all legitimate means—of fair publication, and fair oral or written persuasion, to induce others interested in or sympathetic with their cause, to withdraw their social intercourse and business patronage from the employer. They may go even further than this, and request of another that he withdraw his patronage from the employer, and may use the moral intimidation and coercion of threatening a like boycott against him if he refuse so to do. This last proposition necessarily involves the bringing into a labor dispute between A and B, C, who has no difference with either. It contemplates that C, upon the request of B, and under the moral intimidation lest B boycott him, may thus be constrained to withdraw his patronage from A, with whom he has no controversy. ... In this respect this court recognizes *767 no substantial distinction between the so-called primary and secondary boycott. Each rests upon the right of the union to withdraw its patronage from its employer and to induce by fair means any and all other persons to do the same, and in exercise of those means, as the unions would have the unquestioned right to withhold their patronage from a third person who continued to deal with their employer, so they have the unquestioned right to notify such third person that they will withdraw their patronage if he continues so to deal.” (Pierce v. Stablemen’s Union, 156 Cal. 70, 76, 77 [103 Pac. 324].)
“Labor unions are recognized by the Clayton Act as legal when instituted for mutual help and lawfully carrying out their legitimate objects. They have long been thus recognized by the courts. They were organized out of the necessities of the situation. A single employee was helpless in dealing with an employer. He was dependent ordinarily on his daily wage for the maintenance of himself and family. If the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and to resist arbitrary and unfair treatment. Union was essential to give laborers opportunity to deal on equality with their employer. They united to exert influence upon him and to leave him in a body in order by this inconvenience to induce him to make better terms with them. They were withholding their labor of economic value to make him pay what they thought it was worth. The right to combine for such a lawful purpose has in many years not been denied by any court. The strike became a lawful instrument in a lawful economic struggle or competition between employer and employees as to the share or division between them of the joint product of labor and capital. To render this combination at all effective, . employees must make their combination extend beyond one shop. It is helpful to have as many as may be in the same trade in the same community united, because in the competition between employers they are bound to be affected by the standard of wages of their trade in the neighborhood. Therefore, they may use all lawful propaganda to enlarge their membership and especially among those whose labor at lower wages will injure their whole guild. It is impossible to hold such persuasion and propaganda without *768 more, to be without excuse and malicious.” (American Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184 [27 A. L. R. 360, 66 L. Ed. 189, 42 Sup. Ct. Rep. 72]; Sayre’s Cases on Labor Law, 213, 219, 220.)
“So, also, the laborers have the right to fix a price upon their labor, and to refuse to work unless that price is obtained. Singly, or in combination, they have this' right. They may organize in order to improve their condition and secure better wages. They may use persuasion to induce men to join their organization or to refuse to work except for an established wage. They may present their cause to the public in newspapers or circulars in a peaceable way, and with no attempt at coercion. If the effect in such case is ruin to the employer, it is damnum absque injuria, for they have only exercised their legal rights.” (Beck v. Railway Teamsters’ Protective Union, 118 Mich. 497 [74 Am. St. Rep. 421, 42 L. R. A. 407, 415, 77 N. W. 13].)
“Those who labor for wages have certain rights equally unquestioned. They may contract for employment on whatever terms they see fit, and, unless restrained by a binding contract, may cease employment when they please. They have a right to form unions for the purpose of improving their economic and social conditions, or to refrain from joining such unions if they choose. They have a right to strike in concert when the object of the strike is for their collective benefit. They have a right to acquaint the public with the fact of its existence and the causes thereof, and appeal for sympathetic aid by a request to withhold patronage. . . .
“It is clear that any resort to the primary boycott, if in any degree successful, will result in damage to the business of the person boycotted; but, where it is lawfully conducted, this is one of the inconveniences for which the law does not afford a remedy.” (Robison v. Hotel & Restaurant Employees, Local No. 782, 35 Idaho, 418 [27 A. L. R. 642, 207 Pac. 132].)
The right of free speech and of a free press is guaranteed by the Constitution of California (art. I, sec. 9.)
“Liberty of circulation is as essential to that’ freedom as liberty of publishing; indeed, without the circulation the publication would be of little value.” (Ex parte Jackson, 96 U. S. 727 [24 L. Ed. 877, 879].)
*769 “The word ‘publish’ ordinarily means to disclose, reveal, proclaim, circulate or make public.” (In re Monrovia Morning Post, 199 Cal. 263, 266 [248 Pac. 1017].)
The constitutional guarantee against the abridgment of the freedom of the press means, first of all, immunity from restraint previous to publication. No general restraint previous to publication has been exercised in the English-speaking world since the lieensing-of-printing act of the Long Parliament against which John Milton’s A'reopagitica was directed. The guarantee is also a positive injunction against the curtailment of the right of expression after it is made, subject, of course, to war-time restrictions or to such restrictions as may be imposed upon expressions in advocacy of violence. (Schenck v. United States, 249 U. S. 47 [63 L. Ed. 470, 39 Sup. Ct. Rep. 261]; Stromberg v. United States, 283 U. S. 359 [75 L. Ed. 1117]; Near v. Minnesota ex rel. Olson, 283 U. S. 696 [75 L. Ed. 1357]; People v. Steelik, 187 Cal. 361 [203 Pac. 78].) In California, injunctive relief against the publication of what (upon publication) might be libel or contempt is denied. (Goldberg, Bowen & Co. v. Stablemen’s Union, 149 Cal, 429 [117 Am. St. Rep. 145, 9 Ann. Cas. 1219, 8 L. R. A. (N. S.) 460, 86 Pac. 806]; In re Wood, 194 Cal. 49 [227 Pac. 908]; Dailey v. Superior Court, 112 Cal. 94 [53 Am. St. Rep. 160, 32 L. R. A. 273, 44 Pac. 458]. See, In re Shortridge, 99 Cal. 526 [37 Am. St. Rep. 78, 21 L. R. A. 755, 34 Pac. 227].)
The portion of the ordinance under which the defendants stand convicted was aimed more at boycotting than at picketing. It was aimed at oral means of inducing persons not to enter the premises or to trade or work upon them. The use of printed means is covered by section 2. The Supreme Court has expressed doubts about the constitutionality of that section, particularly as it applies to “loitering”. (Matter of Williams, supra.) We take it that even that section, in so far as it prohibits the use of banners, signs and other similar physical means of persuasion, was aimed at banners or signs or circulars which are exhibited or offered free and not those which are, like a newspaper, offered for sale. The persuasion at which the section is directed is the direct persuasion not to patronize or work, and not the indirect persuasion, which comes from adhering to a cause by being convinced of its justness. Were it otherwise, if *770 a labor union should induce a newspaper of general circulation to publish an article in advocacy of its cause, in the course of a labor difficulty, the circulation of the newspaper in the vicinity of another’s place of business might be entirely prohibited upon the ground that the reader might, by reading it, be convinced of the rightness of the union’s cause and be induced to refuse to patronize or work. At the oral argument counsel for the people contended for such power. But we know of no decision which would recognize it. The statement in Crouch v. Central Labor Council, 134 Or. 612 [293 Pac. 729], to the effect that the display of a newspaper is “equivalent to carrying a banner or wearing a sash with objectionable reference” and that such display might be prohibited was not made in an action under a statute or ordinance prohibiting the doing of the act. It arose in a proceeding in equity. The same court, in interpreting an anti-picketing ordinance, has held that such an ordinance cannot be sustained if it denies the lawful doing of a lawful act, such as the right to strike. (Hall v. Johnson, 87 Or. 21 [Ann. Cas. 1918E, 49, 169 Pac. 515].) And while courts have upheld laws aimed at the suppression of particular issues of indecent publications, we doubt if any constitutional authority or principle could be found which would sustain an ordinance which sought to suppress the circulation of a newspaper in the vicinity of a place of business merely because its purchase by prospective patrons might result in the withdrawal of patronage or work. The freedom of the press would 'become illusory if it hung on so slight a thread. What precedes relates more to section 2 of the ordinance. It may seem beyond the issues here involved, because the trial court granted a new trial as to the counts based upon it. It is referred to because a good portion of the argument of counsel for the people is directed to the point that the acts of the defendants amounted to picketing. “Picketing” proper is denounced by section 2 of the ordinance. The first part of section 1, under which count 1 of the three complaints was drawn, is directed at boycotting. The purpose alleged in the complaint is “inducing, influencing and attempting to induce and influence persons to refrain from entering a certain place of business; and for the purpose of inducing, influencing and attempting to induce and in *771 fluenee persons to refrain from purchasing tickets from a certain place of business, to-wit: Rialto Theatre, located at 812 South Broadway in the city of Los Angeles.”
We conclude that neither the sale of the newspaper nor its display would constitute a violation of the ordinance. Nor would it be a violation of the ordinance to cry out the headlines, as a part of an appeal to buy the newspaper, whatever form that appeal might take. If the evidence in the record indicated that the defendants confined themselves to announcing “Extra. Bead the Citizen. All about the Bialto Theatre being unfair,”, or words to similar effect, the judgment could not be upheld. For, aside from the general constitutional considerations heretofore adverted to, the news vendors would come clearly within the exception of Ordinance No. 6859 N. S., the more so as the evidence shows that the manner of calling did not differ from that used by newsboys in ordinary cases.
However, there is evidence in the record' which shows clearly that the newsboys in calling out did not always use the phrase “Rialto Theatre unfair to labor” in conjunction with an appeal to read or buy “The Los Angeles Citizen”. There is evidence in the record that the reference to the newspaper was omitted altogether. The words “Rialto Theatre unfair to labor” thus became words intended to achieve the result denounced in the ordinance, and charged in count 1 of the complaints. And the mere fact that, at the same time, the newspaper may have been exhibited does not change the character of the words. A careful examination of the record shows that this occurred upon all the dates charged in the complaints—December 3, 4 and 11. The charge as to December 17th against the defendant Dufrane is not supported by the evidence. This is conceded by the people. There was no calling out on that day. But while evidence was directed to this date we find no count in the complaints based upon it. As to other days, the evidence is clear that he placed the newsboys (Doyle, Hough and Apac) upon the north and south property line of the theater, told them what to say, and that, when he did not himself participate in calling out, he directed their actions in such a manner as to be held responsible for the words used, even though he may have testified that his instructions to them were to mention the newspaper in conjunction with what they called out. (People v. Wilson, *772 93 Cal. App. 632, 636 [269 Pac. 951].) The judgment as to him and Apac, Doyle' and Hough is sustained by the evidence. However, the judgment cannot be sustained as to the defendant Armentrout. Certain general considerations should precede the examination of the testimony as to the connection of the defendant Armentrout with the acts of December 3, 1930, charged in complaint No. 19,539. What are the circumstances under which a person may be charged with criminal responsibility for the acts of his agent?
“A principal, in order to be held criminally liable, must be shown to have knowingly and intentionally aided, advised, or encouraged the criminal act committed by the agent.” (People v. Doble, 203 Cal. 510, 511 [265 Pac. 184].)
“Before one can be convicted of a crime by reason of the acts of his agent a clear case must be shown. The civil doctrine that a principal is bound by the acts of his agent within the scope of the agent’s authority has no application to criminal law.” (People v. Green, 22 Cal. App. 45, 50 [133 Pac. 334].)
Such is also the law elsewhere. (2 Cor. Jur., p. 855; 8 R. C. L., pp. 65, 66 et seq.; Rex v. Huggins, 2 Ld. Raym. 1574 [92 Eng. Rep. 518] [a leading case on the subject].)
Excepting offenses like libel, or violations of revenue or liquor law, or pure food laws, or laws against public nuisances, or ordinances under police power, which make the doing of an act a crime irrespective of criminal intent, there can be no criminal responsibility of the principal for the act of the agent. Only when the principal aids, abets, commands or assents to the criminal act can he be held responsible for a crime of which intent is an essential ingredient which is not supplied by law or implied from the doing of the act. (People v. Moore, 82 Cal. App. 739, 747, 748 [256 Pac. 266].)
“If, at common law, crime when committed by the individual consists of acts done with an evil intent, in statutory offenses created in the exercise of police power, unless a wrongful intent or guilty knowledge, commonly designated by the use of the words ‘wilfully’ or ‘maliciously’, is made an essential element of the prohibited act, the violator may be convicted and punished even if he has no design to disobey the law.” (Commonwealth v. New York C. & H. R. R. Co., *773 202 Mass. 394 [132 Am. St. Rep. 507, 16 Ann. Cas. 587, 23 L. R. A. (N. S.) 350, 351, 88 N. E. 764].)
The liquor selling eases and the police power regulation cases draw the same distinction. (People v. O’Brien, 96 Cal. 171, 175-179 [31 Pac. 45]; People v. McLennegen, 195 Cal. 445-469 [243 Pac. 91]; People v. Dillon, 199 Cal. 1, 7-9 [248 Pac. 230]; People v. LeBaron, 92 Cal. App. 550, 568 [268 Pac. 651, 269 Pac. 476]; for the law elsewhere, see Commonwealth v. Warren, 160 Mass. 533 [36 N. E. 308]; Commonwealth v. Sacks, 214 Mass. 72 [Ann. Cas. 1914B, 1073, 43 L. R. A. (N. S.) 1, 100 N. E. 1019], and note thereto, at 43 L. R. A. (N. S.) 2 et seq.; Spokane v. Patterson, 46 Wash. 93 [123 Am. St. Rep. 921, 13 Ann. Cas. 706, 89 Pac. 402, 8 L. R. A. (N. S.) 1104]; note, 28 A. L. R. 1389 et seq.) Where “willfulness” is made a vital ingredient of a crime it implies “knowledge and purpose to do wrong”. (People v. Swiggy, 69 Cal. App. 574, 581 [232 Pac. 174].)
Strictly speaking, there can be no ratification of a criminal act in which a specific intent is necessary.
“He (the principal) must be liable, if at all, at the time the act is done.” (Clark & Marshall on Crimes, 3d ed., sec. 194, p. 255.)
“He only is criminally punishable who immediately does the act or permits it to be done.” (Rex v. Huggins, supra, 2 Ld. Raym., at p. 1580.)
It must be evident that by the enactment of section 1 of the ordinance against picketing the council of the city of Los Angeles intended to punish not the mere doing of certain acts, but the doing thereof with the specific purpose (i. e., intent) there denounced, namely, to induce or influence persons to refrain from entering a place of business, or from trading therein, or workmen from working or offering to work therein. The words “intent” and “purpose” express the same thought and idea. (See Estate of Olmstead, 122 Cal. 224, 232, 233 [54 Pac. 745]; 6 Words and Phrases, 3d Series, p. 460.)
There was thus created an offense like many others we have, in which the criminal intent (or purpose) implied from the doing of the act is not sufficient—offenses in which a specific intent must exist. (People v. Weston, 32 Cal. App. 571 [163 Pac. 691] [assault with intent to commit murder]; People v. Lee Kong, 95 Cal. 666 [29 Am. St. Rep. *774 165, 17 L. R. A. 626, 30 Pac. 800] [assault with intent to commit murder]; People v. Fleming, 94 Cal. 308 [29 Pac. 647] [assault with intent to commit rape]; People v. Stewart, 97 Cal. 238 [32 Pac. 8] [assault with intent to commit rape].) In such cases the defendant to be guilty must “specifically contemplate” the ultimate act. Otherwise, he is not guilty. Without this specific intent there can be no such crime. (People v. Mooney, 127 Cal. 339 [59 Pac. 761].)
Intent of this character cannot be imputed to a person through an agent—without the principal’s direct participation.
To be guilty of this intent there must be command, direction or consent by the principal to the doing of the very act. There is no such consent shown here as to the defendant Armentrout.
The record shows that Armentrout’s duty was to check the number of patrons going to the theater. He did not call out any words or urge anyone to buy a newspaper. He was seen the Friday before the occurrence to hand the newspapers to some of the newsboys. None of the officers saw him exhibit any of the newspapers. There is testimony to the effect that about November 14, 1931, Armentrout told one of the officers that he was hiring the boys and that he told the officer who protested that the new's-boys were crying too loud that he could not beep them from so doing. This is too remote to infer a hiring on December 3d, 4th and 11th. This conversation was denied by him. He also denied that he ever gave the newsboys any money, as one of the officers testified. What the money was for was not stated. Armentrout admitted that he may have given them a dollar or two while they were waiting for the man who paid them. While he was about the premises he exercised no direction or control over them. No one ever saw him give them any directions. We cannot infer direction even from hiring, assuming the evidence shows hiring. It may be true that intent may be inferred from the circumstances surrounding the doing of an act. (People v. Franklin, 46 Cal. App. 1, 5 [188 Pac. 607]; People v. Bowman, 24 Cal. App. 781 [142 Pac. 495]; People v. Moore, supra, p. 748 [82 Cal. App. 739, 256 Pac. 266].) It is also true that participation may be inferred from presence *775 at place of crime. (People v. Wilson, 93 Cal. App. 632 [269 Pac. 951].) But there must be something more than mere presence or association in order that a concert of action be inferred. (People v. Long, 7 Cal. App. 27, 33.) And the purpose of the act must be shown to have been authorized or within the contemplation of the principal. (People v. Green, supra; People v. Doble, supra.) There must be something from which the court or jury can infer that the principal had formed “the intent and purpose” to do the act denounced by the statute. (See People v. Smith, 96 Cal. App. 373, 378-380 [274 Pac. 451]; People v. Baba, 101 Cal. App. 723 [282 Pac. 403].) There is nothing in the record here from which such inference can be drawn— nothing from which to infer that Armentrout was there for the purpose of aiding in the violation of the ordinance by the other defendants. His act in checking the theater patronage was a legal act, done in a legal manner. He cannot be held criminally liable for the acts of the newsboys merely because he also was engaged in some work for the cause which the newsboys had also been hired to serve. (See Union Labor Hospital v. Vance Lumber Co., 158 Cal. 551, 556, 557 [33 L. R A. (N. S.) 1034, 112 Pac. 886].)
The judgment as to Armentrout should be reversed. As to the other defendants the judgments are affirmed.