[Crim. No. 371.  Third Appellate District.—January 22, 1917.]

# THE PEOPLE, Respondent, v. MARY WESTON, Appellant.

CRIMINAL LAW—ASSAULT WITH INTENT TO COMMIT MURDER—INTENT—QUESTION OF FACT.—In a prosecution for the crime of assault with intent to commit murder the question of intent is one of fact for the jury.

ID.—ATTEMPT TO MURDER—INTENT TO TAKE LIFE.—While to constitute murder the guilty person need not intend to take life, he must specifically contemplate the taking of life to constitute an attempt to murder.

ID.—TRIAL—ATTENDANCE OF PHYSICIAN UPON JUROR—LACK OF MISCONDUCT.—It is not misconduct of the jury for the elisor in charge to permit a physician to enter the jury-room, in which the jury was deliberating upon a verdict, for the purpose of attending a juror who had been taken suddenly ill, where the elisor remained in the room and no communication as to the trial passed between the juror and physician.

ID.—KIND OF WEAPON USED—ARGUMENT OF DISTRICT ATTORNEY—LACK OF MISCONDUCT.—Where in a prosecution for assault with intent to murder, the character of the weapon was not conclusively shown, it is not misconduct for the district attorney to argue that the weapon used was a shotgun instead of a rifle.

APPEAL from a judgment of the Superior Court of El Dorado County, and from an order denying a new trial. N. D. Arnot, Judge.

The facts are stated in the opinion of the court.

Wm. F. Bray, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

CHIPMAN, P. J.—Defendant was informed against by the district attorney of El Dorado County for the crime of assault with intent to commit murder. Upon her trial the jury returned a verdict of guilty as charged. Defendant moved for a new trial, which was denied, and she was thereupon sentenced to imprisonment in the state prison for the term of

ten years. Defendant appeals from the judgment and from the order denying her motion for a new trial.

It appeared that one Harry J. Stevens had a mining claim in the near vicinity of the defendant's home, and had been accustomed to go to and from his cabin by a road leading past the Weston house. It was shown that this road, for some distance beyond the Weston's house, had been used as a public highway for thirty or forty years. It had not been used beyond the Weston's place for wagons for the past two or three years, since about the time the Westons came there, but was used for horsemen and footmen. Stevens' mining claim was situated at one side of this part of the road and was reached from the road by a trail. It appeared that, some time in the early part of 1916, someone shot a dog belonging to the Westons, but it appeared that Stevens had nothing to do with this shooting though the defendant accused him of doing it. Up to this time his relations with the Westons were friendly, and he had used this road without objection, and was told that the notices against trespassing, posted by the Westons, were not intended to prevent his using the road, but were rather aimed at stockmen who left their gates open. However, in April, 1916, after the dog shooting (the dog was not killed), the Westons, husband and wife, went to Stevens' cabin and told him he was forbidden to use the road and if he did so "must take the consequences." Stevens ceased using the road and found his way to and from his cabin by another but circuitous route considerably longer than by this old road. On the 4th of June, 1916, he had been at a neighboring place and was taking from there to his cabin a bag of soiled clothing, as he testified, to be washed, and as he was on foot, and the nearest way to his cabin was by this old road past the Westons, he took that route. When he reached a point on the road in view of the Weston premises, the Westons were engaged in planting garden seeds at a point south of their house, and about 180 feet from the road where Stevens appeared. Defendant left her husband and hurriedly went to the house and got a gun and, according to Stevens' testimony, she appeared next near the northwest corner of the hen-house with the gun at her shoulder in a position to fire at him, and commanded him to stop and go back. He testified:

"As I came around the turn I saw Mr. and Mrs. Weston standing below the house working in the garden.

"Q. You were coming down the road, going easterly to your place? A. Yes, sir.

"Q. And the Weston house would be off to the south? A. It would be right off to the lower side of the road. . . . They were apparently putting in a garden below the ditch. . . .

"Q. State what transpired then. A. I saw Mrs. Weston run toward the house.

"Q. What house is that? A. The Weston house. The next thing I knew I saw her standing out by the chicken-house with a rifle apparently pulled to the shoulder.

"Q. One minute—this chicken-house, whereabouts is that? A. It sets in a northerly direction from their house, about ten or fifteen feet from the house I should judge—between the house and the road.

"Q. What kind of a gun, do you know? A. As near as I can say what I would call it was a Marlin rifle that they own.

"Q. What was her position with that rifle? A. Apparently to the shoulder when she came to a stop. . . . As near as I can place it, she was very near to the northwest corner of the chicken-house, that is as near as I could state. . . . Weston was down in the garden.

"Q. Now, what transpired? A. She told me, she says, 'You have been warned what you may expect for traveling here'; she said for me to go back. I asked her, as near as I can remember, if she would not put the gun down."

He testified that he thought it was one hundred or one hundred and fifty feet from where he stood to where Mrs. Weston was at this time; that he was on the road and she was inside the fence and by the hen-house.

"Q. When you said that what transpired? A. It was a very few seconds when she fired. I fell to the ground where the blood spot was seen by the sheriff and others that went there."

This blood spot and other objects in the immediate vicinity were located by the county surveyor, who made a diagram or map of the premises and other objects, which was used at the trial.

"Q. What was the effect of that shot? A. I was blinded instantly. I fell to the ground. George Weston came up and I says, 'I want to go to Indian Diggings.' They was talking there for a few minutes and he says to her to get a

bucket of water and she immediately went and got a bucket of cold water and started to bathe off the blood and she says, 'You are not badly hurt'; she says, 'you have just got a little of the same thing you caused my dog to get.' She said further, she says, 'I am treating you better than you would treat me, because you would go off and leave me.'

"Q. Go on. A. So in a few minutes—I don't know how long—I got to my feet and reached for my sack; I says, 'I want to go to Indian Diggings' and George, he says, 'All right.' I started to walk and I walked to the top of the hill going back the same way I came, but instead of going up the road I went down towards Indian Diggings; I went a little ways and then I said I could go no further and I laid down and he went on to Indian Diggings and when he returned he brought Lon Votaw back with him.

"Q. What was the nature of this shot—what was in the charge? A. It was charged with bird shot.

"Q. Where did it strike you? A. It struck me full on the forehead and in the face. There were a few scattered ones, one struck my hand, a couple struck against the teeth, but the heavy shot struck my forehead. It also showed at the examination after the swelling was removed from the eyes, it showed that there was two shot in the eye on the right side and one went around the ball of the eye on the left side and left it permanently blind.

"Q. Can you see out of your eyes? A. I can see a little light with the right eye.

"Q. You cannot see with the left eye at all? A. Not at all.

"Q. How long was it after you saw the Westons there in the garden south of the fence and by the ditch—how long was it after you saw them there before Mrs. Weston fired this shot at you from the hen-house? A. The time between?

"Q. Yes, between those. A. It was a very few minutes, because it was a short distance to the place where I stood still."

Weston assisted in taking Stevens to the Staten Mill, a few miles from Weston's, where he received temporary treatment by Dr. Wrenn soon after the shooting and was later removed to Plymouth and still later to Sacramento for treatment. The left eye was destroyed and the sight of the other so far impaired as that he could only distinguish day from night.

Dr. Wrenn testified that shot was found in all parts of his face and in his hand with which he was supporting his bag of clothes on his shoulder; that he extracted or found evidence of seventy-five separate shot that struck Stevens about the face and head—"the scalp was badly plowed up as is shown by the scars on his head." He bled profusely at the point where he was shot and the doctor found his wounds still bleeding.

On cross-examination Dr. Wrenn testified:

"Q. Would the others, doctor, as a professional man, be of any danger to life, those you have testified to, one in the arm, one in the hand, one on the lip, two or three through the ears and twenty-five or more lodged around the eye, would either one of those under any circumstances be likely to produce death? A. Well, hardly.

"Q. Well, as a matter of fact, would they produce death? A. Where these shot lodged it is doubtful if they could produce death or they would have done so.

"Q. You testify as a professional man that a shot fired that way could not produce death? A. I testify this way, that the shot that struck him at the points where they struck evidently could not produce death or they would have done so, had they hit in other parts it could.

"Q. What other parts? A. If the twenty-five shot that struck him around that eye had struck the soft portion of the neck here [showing] it could easily have punctured the jugular vein and the carotid artery. The pneumogastric nerve and the phranic nerve which control the action of the heart and the respiration, if any of those had been struck it could have caused death, but striking where it did it could not cause death."

On redirect he testified:

"Q. What you mean to say in this case is this, that in so far as these wounds are concerned that happily they turned out not quite mortal at present, that is the idea? A. They are not mortal.

"Q. At the present time, but had the same impact—the same shot hit a little lower down, for instance here [pointing to own throat] in the region of the jugular vein and carotid artery, the chances are that the same impact, the same five or

seven shot would have been mortal if they had penetrated to the same depth? A. It could have been.''

There were no witnesses to the shooting except defendant and her husband and Stevens. Mrs. Weston's testimony was that as soon as she saw Stevens coming along the road she went to the house, got the gun which she said was a 30–30 Marlin rifle loaded with bird shot No. 6, which she took ''for her protection''; that she went out of their inclosure to the road and confronted Stevens. She testified:

''I told him to go back up the trail, that he had been forbid trespassing across the premises and I didn't want him to go across.

''Q. What did he say to you in response, if anything? A. He said he would not do it; he said he wished me to understand he was not afraid of me nor my gun—that me nor my gun could not bluff him.''

She testified that Stevens pushed her out of the road and faced her again down by the gate.

''Q. Did he come toward you or threaten you then? A. Yes, sir; I raised the gun and then he stopped and then I lowered the gun; he started again; I didn't know whether he was going to grab me or what he was going to do; anyway I raised the gun and fired at the same time and that is all.I remember.

''Q. What position did you have the gun in when you fired? A. I had it up like this [showing].

''Q. By your side? A. Yes, sir.

''Q. Did you fire that gun intentionally? A. No, sir; I did not.

''Q. Did you intend to shoot Mr. Stevens? A. No, sir; I did not.

''Q. Do you know how that gun went off, whether you pulled the trigger or whether you did not? A. I can't say that; I was excited at that time.

''Q. Were you afraid of Mr. Stevens? A. I was afraid of him—I did not intend he was going by me.''

Her testimony was that when the ''gun went off'' she was within eight or ten feet of Stevens. It appeared that at the request of her husband she got some water and bathed Stevens' face. On cross-examination she testified:

''Q. What did you get the gun for? A. For protection.

"Q. Why didn't you stay with your husband if you wanted protection? A. Well, I didn't intend Mr. Stevens were going through my premises after I had forbid him of crossing, and he still insisted on crossing.

"Q. Well, you would have had all the protection you wanted if you had stayed with your husband; Stevens was not coming up to where you were, was he? A. I know; but it was my premises; I am entitled to defend them after my dog had been shot.

"Q. So you went and got your gun? A. Yes, sir; I did.

"Q. You went out to where Stevens was? A. Yes, sir; I went up to where Stevens was coming in the road.

"Q. The gun was shot off there, was it? A. It was fired off there.

"Q. You left your husband where he was? A. Yes, sir; I didn't cart him along.

"Q. You didn't need him for protection, did you? A. Need my husband? No. I was capable of taking care of myself.

"Q. Now, you shot him because he was trespassing, didn't you? A. Yes, sir; after he had been forbid."

She admitted having told the sheriff that she shot Stevens because he was trespassing.

"Q. Did you tell the sheriff that it was an accident at the time? A. No, sir; I did not.

"Q. Did you say anything about it being an accident? A. No, sir.

"Q. You did tell him that you shot him because he was trespassing, is not that right? A. I shot him after he was trespassing because he had been forbid.

"Q. And you so told the sheriff? A. I so told the sheriff them same words.

"Q. But you didn't tell him that the gun had gone off accidentally or anything of that kind? A. Well no; I did not."

Weston's testimony was that defendant did the shooting with a Marlin 30–30 rifle which he had loaded with black powder and No. 6 shot to kill a hawk which had been troubling their chickens. There was no dispute as to the size of the shot. The Westons were known to have a shotgun, but Weston testified that it was at a neighbor's house at the time of the assault on Stevens. Stevens thought the gun used was a Marlin rifle,

32 Cal. App.—37

although from where he stood he may have been mistaken. He was mistaken as to the distance from where he stood to the hen-house, where he testified defendant stood when she shot him. The measured distance was sixty-seven feet. Defendant's testimony was that she was within eight or ten feet of Stevens when the gun was fired. The evidence tended to show that if the gun used was a Marlin rifle, and was loaded as Weston said he loaded it, and if it was discharged within eight feet of Stevens he would have had a slim chance of escaping with his life. There is a direct conflict between Stevens' account of the shooting and the defendant's account of it, and it was with the jury to decide which one to believe.

So, also, was the question of intent one of fact and for the jury. While, to constitute murder, the guilty person need not intend to take life to constitute an attempt to murder he must so intend. He must specifically contemplate the taking of life; and though his act is such as, were it successful, would be murder, if in truth he does not mean to kill, he does not become guilty of an attempt to commit murder. (*People* v. *Mize*, 80 Cal. 41, [22 Pac. 80].)

The evidence showed that defendant cherished a feeling of ill will toward Stevens which was exhibited in her forbidding him from using the road where it passed her house (she claimed to own the premises); that in giving him warning he was told that if he used it he might expect to take the consequences. When she first saw Stevens coming along the road she ran to the house for a gun, and from a place where she was in no danger from anything Stevens might do she opened fire upon him, according to his account of the shooting, immediately after he had asked her to put down the gun and before she could know whether he intended to go back as she ordered him to do or to continue along the road. That she got the gun for her "protection" seems not to have been necessary or called for, as nothing had happened after her warning to him in April to lead her to suppose he would injure her in any way. He had not used the road during the interval. She testified that she shot him because he was trespassing on her property, and so admitted to the sheriff. She testified, it is true, that she did not intend to kill him, and sought by her testimony to convey the impression that the gun was not discharged intentionally—in fact, that it was an accident. If she shot Stevens because he was trespassing the

shooting could not have been accidental. The reason she gave implies a purpose in doing the act and a purpose implies an intent. What that intent was must be determined from all the circumstances—among them the character of the weapon and the consequences likely to follow the use made of the weapon. There was evidence that had the charge of shot hit Stevens a few inches lower the result might have been fatal.

Defendant, conceding that she might properly have been convicted of a lesser crime, urges "that the jury brought in an excessive verdict." This contention is based upon the assumption that the gun was accidentally discharged, and that defendant's testimony showed that she did not intend to kill Stevens. Defendant overlooks the fact that the jury may not have believed her account of the shooting, which manifestly they did not.

Among the grounds in support of the motion for a new trial was alleged misconduct of the jury. Defendant's attorney deposed that at the close of the trial the jury were placed in charge of Coroner Ruoff and his deputy, Ball, and that, "while the said jury were in said jury-room engaged in the deliberation of said cause so submitted to them, Dr. Joseph T. Wrenn, one of the principal witnesses for the prosecution on the trial of said cause, was permitted by the officers in charge of said jury to enter the said jury-room and to speak to and communicate with said jurors without any order of court made or entered authorizing them to do so." No other fact is alleged in support of the motion.

Ruoff deposed that, about 6 o'clock of the evening of the day when and after the cause was given to the jury, one of the jurors, Morris, "became temporarily ill and asked the officers to call a physician to attend him . . . and affiant believed that it was necessary for him to have treatment by a physician without delay"; that at the time the judge was absent from the courthouse "and there was no one within reach to whom affiant could apply for an order permitting him to call a physician to visit said Morris or to whom he could apply for advice or instructions in that regard"; that he "telephoned for Dr. Joseph T. Wrenn to come to the courthouse at once, and upon the arrival of said doctor, permitted him to immediately enter the jury-room and prescribe for and treat the said juror Morris for his said illness." Ruoff further deposed that he and his fellow-elisor were present within

sight and hearing of the doctor all the time he was in the jury-room, and heard and saw everything that transpired, which consisted only of questions by the doctor to and answers by the said juror relative to his sickness, and that at no time did the said doctor speak to any other juror, and that during all the time he was in the jury-room no mention of the said trial or of anything connected therewith was mentioned by any-one.   Elisor Ball and juror Morris deposed to like facts, as did Dr. Wrenn.  The latter deposed that he found "Morris suffering from acute gastritis and conversed with him concerning the symptoms of his illness and prescribed for his said complaint, but did not converse with him upon any subject connected with the above-entitled cause, nor upon any subject whatever except that of his illness," and that he remained within the jury-room but a few minutes; that the juror's illness was not serious, and that he was "quickly relieved from his pain."

The admonition given by the court to the elisors to suffer no person to speak to the jurors or communicate with them, nor to do so himself, "on any subject connected with the trial," was in accordance with section 1121 of the Penal Code.  The provision is important and should be observed.  The statute, however, is to be given a reasonable construction.  An emergency might arise making it imperative for the officer in charge of the jury to enter the jury-room for the purpose of meeting the emergency, and to take with him a person suitable to assist him.  This section of the Penal Code also provides that the jury may be permitted to separate, in the discretion of the court.  In *People* v. *Cord,* 157 Cal. 562, 571, [108 Pac. 511, 515], the court said: "Where the jury has been permitted to separate while deliberating upon a verdict, under such circumstances as to make it appear that they might have been tampered with, a new trial should be granted, unless there is affirmative proof upon behalf of the people explaining the separation and showing that the defendant was not prejudiced thereby.  (Citing cases.)  If this burden is met by the people the new trial should be denied.  We think in this case there was reasonably strong proof that the jury was not tampered with and that defendant suffered no prejudice from the confusion and slight separation growing out of the alarm of fire. . . . There was no attempt to show the slightest bad conduct on the part of any member of the jury, or any effort

by any person to approach or influence them in any way.''
So here, no attempt was made to show any communication
with the jury either by the elisors or by the doctor, except as
he explained, and it was shown that no one spoke to any juror
''on any subject connected with the trial.'' If the strict rule
laid down in the Cord case applies here we think the burden
of showing that no prejudice to the defendant resulted from
what occurred in the jury-room was fully and successfully
met by the prosecution.

Misconduct of the district attorney in addressing the jury
is also claimed to have been prejudicial to defendant. The
alleged misconduct consisted in the district attorney's ad-
vancing a theory, based upon his view of the evidence, that
defendant had used a shotgun instead of a Marlin rifle.
Stevens did not claim to be certain as to the kind of gun
used; he thought it was the Marlin rifle the Westons were
known to possess. They also owned a shotgun, but Weston
testified it was not then at their house. There was much evi-
dence as to the effect of a charge of shot fired from a 30–30
rifle loaded with a shot cartridge and the same from a shot-
gun. The facts and circumstances placed before the jury left
the question of the kind of gun used and the character of the
charge for the jury to determine. In arguing from the evi-
dence and circumstances that a shotgun was the weapon used,
we do not think the district attorney went outside and beyond
the evidence. No motion was made by defendant to have the
remarks complained of withdrawn nor was the court requested
to instruct the jury to disregard the remarks.

The judgment and order are affirmed.

Hart, J., and Burnett, J., concurred.