[Crim. No. 5364. Second Dist., Div. Two. July 29, 1955.]

THE PEOPLE, Respondent v. JACK BAILEY KUYKENDALL et. al., Appellants.

John L. Seitz, Charles E. Ogle and Martin Polin for Appellants.

Edmund G. Brown, Attorney General, and Jay L. Shavelson, Deputy Attorney General, for Respondent.

McCOMB, J.—From judgments of guilty of (1) robbery in the first degree, (2) assault with intent to commit robbery, in violation of section 220 of the Penal Code, and (3) two counts of assaulting Messrs. Lopez and DeCorona by means of force likely to produce great bodily harm in violation of section 245 of the Penal Code, defendants appeal. There is also an appeal from the order denying their motions for a new trial.

*Questions*: First: *Was there substantial evidence to sustain the verdicts of guilty?*

*Yes.** The record discloses that on the morning of July 12, 1954, four Mexican citizens working as farm laborers went from their camp in Grover City, California, to nearby Pismo Beach. After a day spent in drinking beer, playing billiards and buying clothing, they were under the influence of alcohol to varying degrees and sought a taxi to take them back to camp.

---

*The evidence is viewed in the light most favorable to the People (respondent). See *People* v. *Pianezzi*, 42 Cal.App.2d 270, 277 [2] [108 P.2d 685] (hearing denied by the Supreme Court).

While looking for a taxi, they were approached by defendant Luna who spoke to them in Spanish and offered them a ride to their camp. He then hailed a passing light panel truck in which were sitting his friends, defendants Kuykendall and Norred. The truck stopped and the four laborers climbed onto the rear while defendant Luna entered the cab.

As the truck left Pismo Beach, it was traveling very fast and went past the camp where the laborers lived. When the truck passed the camp, the laborers shouted and told defendants to stop but they did not. The truck later slowed down to make a turn, and two of the laborers jumped off. The truck then stopped near a liquor store belonging to Peter Santos.

Otilio Lopez, one of the victims, testified that when the truck stopped, his companion DeCorona stepped off the truck, and was struck a blow by defendant Kuykendall while defendant Norred held a knife. Defendant Kuykendall held one of the victims and defendant Luna held the other while defendant Norred stepped onto the running board of the truck and struck the victims with a metallic object. Defendant Kuykendall rolled one of the victims over and went through his pockets; another defendant took a wrist watch from the wrist of one of the victims.

Clearly the foregoing evidence is sufficient to sustain the verdicts of guilty. Further discussion of the evidence would serve no useful purpose.

There is no merit in defendants' contention that the evidence fails to disclose the intent with which defendants acted. Section 21 of the Penal Code reads in part thus: ''The intent or intention [with which a crime is committed] is manifested by the circumstances connected with the offense, and the sound mind and discretion of the accused. . . .'' The element of intent is rarely susceptible of direct proof and must usually be inferred from all the facts and circumstances disclosed by the evidence. ▪ Where the evidence is sufficient to justify a reasonable inference that such intent existed, as in the present case, the verdict may not be disturbed. (*People* v. *Smith*, 84 Cal.App.2d 509, 512 [190 P.2d 941].)

▪ Second: *Was the jury properly and adequately instructed on the question of intent?*

*Yes.* The trial court instructed the jury that criminal intent is the intention to do the act which constitutes a violation of the law, and does not necessarily involve an intent to violate the law, and hence that ignorance of the illegal nature

of the act is not a bar to conviction. (See *People* v. *Durrant*, 116 Cal. 179, 208 [48 P. 75].)

In addition, the trial court read to the jury as part of its instructions section 211 of the Penal Code, defining the crime of robbery. It is settled that reading to the jury the statutory definition of a crime is sufficient. (*People* v. *White*, 5 Cal.App. 329, 335 [90 P. 471].)

■ It is true the general rule in a criminal case is that it is the duty of a trial judge to instruct the jury on its own motion, charging them fully and fairly on the law relating to the facts of the case, and it is not relieved of the duty to give such instructions merely because they are not requested. (*People* v. *Baker*, 42 Cal.2d 550, 576 [20] [268 P.2d 705].) However, there is an exception to this general rule that instructions defining the elements of an offense may be couched in the language of the code where no instructions in elaboration of the principles of statutory definitions are requested by defendant. (*People* v. *Reed*, 38 Cal.2d 423, 430 [1] [240 P.2d 590].)

In *People* v. *Reed, supra*, at page 430, our Supreme Court quotes with approval from *People* v. *Carothers*, thus: " 'Where an instruction on a particular point or points as given by the court is correct as far as it goes, and the only valid objection, if any, to it is that it is deficient or inadequate by reason of its generality, indefiniteness, or incompleteness, if defendant desires additional, amplified, explanatory, fuller, or more complete, elaborate, comprehensive, definite, specific or explicit instructions on such point or points, he must properly request the same, otherwise error cannot be predicated upon the failure to give such additional instruction.' (*People* v. *Carothers*, 77 Cal.App.2d 252, 255 [175 P.2d 30].)' "

In the case at bar defendants failed to request any proper additional instructions. Therefore the exception to the general rule is here applicable and they may not on appeal urge error in the failure of the court to amplify its instructions.

■ Third: *Did the trial court commit prejudicial error in not instructing the jury regarding expert testimony?*

*No.* A doctor was called by the prosecution who gave testimony relative to the injuries received by the complaining witnesses. The expert witness was a qualified physician, licensed to practice in California. Therefore there was no question as to the correctness of the trial court's ruling in permitting him to testify as an expert.

It was not prejudicial error to fail to read to the jury an instruction regarding expert testimony for two reasons:

(1) The testimony which the doctor gave regarding the extent of the injuries inflicted upon the prosecuting witnesses was a matter of common knowledge to both the court and jury;

(2) It was not prejudicial error to fail to give such instructions for the reason that defendants have wholly failed to call this court's attention to any prejudice resulting to them because the jury was not instructed on this subject. An examination of the record discloses that it is highly improbable that a different verdict would have been returned had the omission not occurred. Therefore since the alleged error was not prejudicial, we must disregard it. (See *People* v. *Riley,* 35 Cal.2d 279, 286 [4] [217 P.2d 625] ; *People* v. *Letourneau,* 34 Cal.2d 478, 492 [9] [211 P.2d 865].)

Fourth: *Did the district attorney commit prejudicial error in making reference in his argument to the fact that defendants had attempted to break into parked automobiles?*

*No.* During the examination of Mr. James Frye by the attorney for defendant Kuykendall, the following occurred:

". . . A. One of the officers got a call on his radio that there were three suspects, or some suspects——

"Q. Did you hear this? A. Yes, I heard it.

"Q. All right. O.K. A. Trying to break into some cars up somewhere near the Pismo Theatre, up near that auto court, and the police went up there, and then a bunch of the crowd went up there to see what was going on. That's when they started chasing around through the back alleys there.

"Q. Who were they chasing then? A. Well, they'd seen these three fellows trying to get into a car.

"Q. What three fellows? A. I don't know. They said they saw three fellows: They called the police and said there were three fellows trying to get into some cars there, and evidently they were all locked, or something; I don't know. They saw them go this way. Some of them saw them go down behind Ford's Market, and the police went that way. And somebody else saw them go down toward the beach, and some officers went down that way, and they started chasing them. And there was different people chasing them, and telling them which way they saw them go, until they run into the cafe there.

"Q. And then what happened? A. Well, I was around in front of the cafe there, and somebody said there was three

men just went in that restaurant there, so the officers went in and looked, and there was five men in there at the time, and so they just went in and brought them all out.

"Q. All five? A. Yes—yes, sir.

"Q. What happened then? A. Well, they questioned the two of them and—they started to question all of them, I guess, and two of them evidently were known, or somebody knew them, or something, and knew where they had been, so they let them go, and the other three they held there for a little bit, and one of them—or they started talking to the officer and telling him that they had an excuse, that they were in a bar or something and was drinking, and the bartender would swear that they were in there for the last hour, or something to that effect. So one of the officers took one of them back down there, and the other officer held the two there in front of the cafe."

The three men who were held were defendants. ■ Thus it appears that the police had a report that three men were trying to break into parked cars. These three men were seen to enter a café. The police entered the café and arrested the three defendants. This would have supported an inference that defendants were the ones who had attempted to break into the cars. However, the district attorney did not state this. He merely stated, "there was a police report that three men were trying to steal a car." This was the testimony elicited from one of the witnesses by defendants' attorney. Clearly the statement was supported by the evidence.

■ Fifth: *Did the trial court err in stating during the voir dire examination of prospective jurors that the defendants "wouldn't be here unless there is some reasonable cause to believe that they had committed a crime?"*

*No.* During the *voir dire* examination of a prospective juror the following occurred:

"[MR. POLIN] Q. Would you apply the yardstick that the Court gives you, that a man is innocent until proved guilty beyond a reasonable doubt?

"[MR. WARNER] A. Yes.

"Q. The mere fact that a defendant is brought here and accused of something, would that indicate to you that he has done something wrong? A. No.

"Q. There seems to be doubt in your voice. A. Well, the way you state the question—you say, 'the fact that a defendant is brought here,' and 'he has done something.'

"Q. And accused of something. A. Well, state it again.

"Q. The fact that a defendant has been brought here and accused of something, would that indicate to you that he has done something wrong? A. Well, he might have done something wrong, but it wouldn't be what he is accused of. He must have done something to be brought here. What he has done remains to be seen, or if he hasn't done anything, but the fact that the defendants are here, there must have been something that happened previously.

"Q. You think he has done something wrong? A. Well, I don't know. I haven't the slightest idea.

"THE COURT: No, he doesn't know; the man is very right. They wouldn't be here unless there is some reasonable cause to believe that they had committed a crime.

"MR. POLIN: Yes—Well, reasonable doubt—cause to believe that they had committed a crime——

"THE COURT: That is what the preliminary examination finds.

"MR. POLIN: I have no further questions.

"THE COURT: The Juror says that they are in here, and he feels that there must have [been] something happened to bring them in here, but whether they are guilty or not, it is for them to determine from the evidence. In other words, the bringing them in here is no evidence of crime.

"MR. WARNER: But they must have done something to be here.

"THE COURT: But it is a means of getting them in here.

"MR. POLIN: Well, of course, there could be a case of mistaken identity entirely.

"THE COURT: What they did may not be a crime, it might not be a crime, but they are here for some reason, that is for sure.

"MR. POLIN: That is for sure.

"MR. OGLE: Your Honor, I am going to also pass for cause Mr. Warner. If I may be heard very briefly on the statement by the Court, that there must be reasonable cause that they had committed a crime, although, I don't have the absolute definition of the effect of being bound over after a preliminary examination at my finger tips, I believe that we have gone a little further than the effect.

"THE COURT: I will read it to you. 'It appearing to me that the offense in the within Complaint mentioned, to-wit: Felony: Violation of Sections 211-220-245-182-1 of the Penal Code of the State of California has been committed, and that there is sufficient cause to believe the within named Jack

Bailey Kuykendall, John B. Norred, aka Larry William Alburn, and Manuel Castillo Luna guilty thereof, I order that they be held to answer the same. Webb Moore, Judge of said Court.'"

The court in its statement to the jurors made a correct statement of the events preceding the trial of defendants and informed them of the proper attitude they should have toward defendants. ▮ It is perfectly proper for the trial judge to inform the jury of the nature of proceedings preliminary to an actual trial where a question arises, as in the instant case, rather than to leave them to speculate as to the nature of such proceedings. ▮ The jurors were clearly informed in the course of this discussion that the fact that defendants were brought before the trial court was no evidence of crime, and that defendants were presumed innocent until proven guilty. For example the trial judge stated:

"This being a criminal trial, we must keep in mind several basic rules: First, that a defendant is presumed innocent until his guilt is established beyond a reasonable doubt; second, that an information which is always filed in the case—not always because sometimes we have indictments by the Grand Jury, but unless there is an indictment by the Grand Jury, an information is filed by the District Attorney. Now, an information is not to be taken as any evidence of the guilt of the defendants. It is a means by which defendants, who the District Attorney has reasonable cause to believe have committed a crime in the County are brought before the Court and a Jury for a trial, so we often refer to an information. Now, that is just simply the instrument—the paper—the document by which defendants are brought before the Court for trial by jury, and it is not to be taken as any evidence of their guilt.

"THE COURT: And, *in* fact that they are brought here, you say you feel that they must have done something or they wouldn't be brought here. Well, maybe they didn't; maybe what they did wasn't a crime. They have that right to have a trial and because they are brought here is no evidence, and you are not to take it as any evidence that they have committed a crime. . . .

"THE COURT: Q. You understand that the burden of proof is upon the People to establish the guilt of the Defendant beyond a reasonable doubt? A. Yes.

"Q. And, I am going to instruct you later on what constitutes a reasonable doubt, and you further understand that

the information which has been filed here is no evidence of their guilt, but they are brought in here for trial by this information, and you are to determine whether they are guilty or not guilty from the evidence presented from the witness chair and my instructions? A. Yes, sir.''

Sixth: *Were the defense attorneys prevented from consulting with each other during the course of the trial?*

*No.* As part of their cross-examination of prosecution witness, Santos, defense counsel wished to arrange a demonstration to test the credibility of the witness' story. The two prosecuting witnesses were needed for this purpose. However, defense attorneys had not arranged for their presence in the courtroom, and this caused certain delay and necessitated conferences among defense attorneys which the trial judge felt could have been avoided by proper outside preparation. He therefore made the following statement:

''THE COURT: All right, let's go on. If we are going to do it, let's do it, otherwise, we'll proceed. You see where we have three attorneys—and you people haven't got together and the trial has been delayed often by consultation back and forth and around. I want this trial to proceed regularly and expeditiously. If you have any counseling to do, you do it before you get in here.''

 It appears that defendants' attorneys were not forbidden to consult one another concerning unexpected developments which arose during the course of the trial, but they were told to coordinate their efforts in advance so as to avoid unnecessary delays. This did not constitute prejudicial error.

Seventh: *Did the trial judge commit prejudicial error by demonstrating prejudice against defendants during the course of the trial?*

*No.* On cross-examination, witness Frye testified that one of the defendants ''was right there at the truck, he just jumped in.'' One of counsel for defendants called the witness' attention to his earlier testimony to the effect that this defendant ''did not have to run . . . and he just got in 'the truck.' '' The court then said: ''Well, why are we concerned how he got in? Do you want to know which foot he put up first?''

There was nothing prejudicial in the court's remark. In any event, such alleged error may not be urged as grounds for reversal by defendants for the first time on appeal since they made no objection at the time of the alleged

error nor did they request the court to admonish the jury to disregard his comment. Therefore any error has been waived. (*People* v. *Roebling*, 14 Cal.App.2d 586, 588 [2] [58 P.2d 929].)

■ Eighth: *Did the trial court commit prejudicial error in reprimanding one of the attorneys for being late for one session of court?*

*No.* The record fails to disclose that defendants were prejudiced by the trial judge's remarks and we must assume that the jury performed their duty and based their verdict upon the evidence and instructions of the trial court and disregarded extraneous matters. (*People* v. *Eggers*, 30 Cal.2d 676, 691 [22] [185 P.2d 1]; *People* v. *Root*, 112 Cal.App.2d 122, 126 [5] [245 P.2d 679].)

■ Ninth: *Did the trial court interfere with relevant questioning by counsel for defendants?*

*No.* During the course of the examination of a witness the following occurred:

"Q. Oh, you turned back your head to look at Pete? A. Yes, I was seeing where he was. You know he was back phoning and I was looking back there.

"Q. How long did you look back at Pete? A. Well, I don't know.

"THE COURT: Well, she said that was when he was phoning. That was after it was all over.

"MR. POLIN: Q. Was that while the boys were still out there? A. Yes, he phoned just as soon as they, and know—they all got out, he phoned.

"Q. But when you looked back to look at Pete, was that while the fellows were still out there in front? A. Yes, they were still out there, yes."

In the instance of the examination of another witness the following occurred:

"Q. Had you been to any other place? A. Oh, yes.

"THE COURT: Well, what is the purpose of this, to test his memory, or what?

"MR. POLIN: No; I understand it is customary, in the liquor business, to drink with your customers when you come in to make sales.

"THE COURT: How do you understand that?

"MR. POLIN: Well, I have learned it from acquaintances of mine.

"A. That is against the law.

"MR. POLIN: Well, I have been so told.

"THE COURT: Well, maybe the fellow who told you wasn't a good salesman.

"MR. POLIN: Possibly not.

"THE COURT: Anyway, you couldn't apply that to this man.

"MR. POLIN: I was going to ask him if he had drunk with his customers. I think that is in order; it goes to the competency of the witness.

"THE COURT: Well, you know what he is going to tell you. He said it was against the law. Go ahead and ask him. He wants to know if you had been drinking with your customers that morning.

"A. Well, this was around 7 in the evening. I would say that probably I had 2 or 3 drinks during the day, yes.

"THE COURT: Q. But not with your customers, is that it? A. Well, certainly not in any package store. They don't open bottles.

"MR. POLIN: Q. But you had drinks with your customers, is that correct? A. In bars.

"Q. 2 or 3 did you say? A. Possibly.

"Q. May I ask what kind they were? A. Well, they were probably Early Times because that is what I sell. That is 86 proof, straight whiskey.

"Q. I see. And you drink it straight, do you, sir? A. No, with water—I mean, in a highball.

"Q. And how big a highball, about—would you estimate? (Etc.)"

The trial court's remarks were not improper or prejudicial. Clearly they did not in any way impede relevant questioning by defendants' counsel.

An examination of the record discloses that defendants had a full, fair and impartial trial.

The judgments and orders are, and each is, affirmed.

Moore, P. J., and Fox, J., concurred.

A petition for a rehearing was denied August 11, 1955, and appellants' petition for a hearing by the Supreme Court was denied August 25, 1955. Carter, J., was of the opinion that the petition should be granted.