[Crim. No. 2399.   Fourth Dist., Div. Two.   June 28, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. RALPH ROY WILLIAMS, Defendant and Appellant.

Ralph Roy Williams, in pro. per., and Peter G. Nihill, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Elizabeth Miller and Mark W. Jordan, Deputy Attorneys General, for Plaintiff and Respondent.

KERRIGAN, J.—Defendant was charged in two separate counts with the crime of assault with intent to murder (Pen. Code, § 217) his wife and a woman friend of his spouse. The public defender was appointed to represent the defendant; a plea of "not guilty" was entered; a jury trial was waived; and on July 17, 1963, defendant was found guilty on both counts. He was sentenced to state prison with the sentences to run concurrently. Following an appeal from the judgment, the conviction was reversed and the case was remanded for a new trial. (*People v. Williams*, 233 Cal.App.2d 520 [43 Cal. Rptr. 704].)

On July 26, 1963, following the first trial, defendant filed, in propria persona, a notice of appeal from the judgment of conviction; in his notice of appeal, defendant indicated that he had a disagreement with the public defender and requested that the latter be relieved as his counsel; in September-October 1963 the public defender directed letters to the appellate court in which he indicated that the defendant was dissatisfied with the legal services rendered him by the public defender during the course of the initial trial, and in which he further stated that ineffective representation at the trial level would be one of the grounds asserted by defendant in seeking a reversal of the judgment of conviction; thereafter, the reviewing court relieved the public defender and appointed James H. Radcliffe, a private attorney, for the purpose of representing the defendant on appeal; the decision in the initial case reflects that Mr. Radcliffe successfully represented the defendant on appeal in obtaining a reversal of the original judgment. (*People v. Williams, supra,* 233 Cal.App.2d 520, 521.)

Following the reversal, defendant appeared in the superior court on June 18, 1965, for the purpose of arraignment and the resetting of the cause for trial; the following proceedings

then transpired involving the court, the defendant, the district attorney, the public defender, and defendant's father:

[Court] : "Ralph Roy Williams.

"Mr. Williams, the reason you are here is that the District Court of Appeal has made its order reversing judgment, and ordering this Court to give you a new trial.

"It is my duty to tell you you have got every single one of the same legal rights you had before, to wit, to be represented by an attorney at all stages of the proceedings; if you can't afford to hire one, I will appoint a public defender; to get a speedy and public trial, either by a jury or a judge, whichever you prefer, and the Court will subpoena any witnesses, compel their attendance in court to testify in your behalf.

"Mr. Williams, who was your lawyer before?"

[Defendant] : "I didn't have one sir. The public defender's had me [sic] appointed."

[Court] : "I take it you are broke, aren't you? You haven't got any money to hire a lawyer?"

[Defendant] : "No, sir, I am not broke."

[Court] : "I didn't mean personally, but really—"

[Defendant] : "I can't facilitate getting an attorney while I am still locked up, because I don't have the money available to me while I am locked up."

[Court] : "I see. Well, I am not going to let you go on your own recognizance, but I am going to set some bail on you. . . ."

(A discussion then ensured wherein the defendant requested to be released on his own recognizance; the district attorney opposed the motion. The court set bail in the sum of $2,500.)

[Court] : "Do you want me to appoint the public defender for you?"

[Defendant] : "Well, no, sir. I would—I couldn't take the public defender, knowing what this judgment—got up in court, asked the Court to find me guilty in his final argument two years ago.

"I would request that the Court make available to me all the necessary books and directives, so that I could go for myself, or to drop the bail down to approximately a thousand dollars so I may be—I could scrape up a hundred dollars from within the walls, from the things over here. I would greatly appreciate that."

[Court] : "Do you have a friend?"

[Father] : "I am his father. I would like to inquire about

something. Now, I came out from the east after he got into this trouble, after he came back from Viet Naam [*sic*], and I haven't been informed of any of the proceedings, and as far as for representation for him, I will try to contact a very dear friend of mine to see if he will stand for him, and I am sure you know the gentleman if I called his name.

"Now, I don't understand all the legalities and all this sort of thing, but I am very much concerned."

[Court] : "Of course you are."

[Father] : "I have no money, and that wee bit that I had I spent coming out here, you know, to see what the full particulars were, and I would appreciate it if you would put it in a manner where I can have someone to look into it for me, because I have no money. I think he should be entitled to release on his own recognizance. He has been in the service since he was a boy. He has an honorable record, and he came out of the Air Force, and this is the only trouble he ever had in his life. I just want to know, is it possible?"

[Court] : "Well, I have ruled on that, sir.

"And one thing, if I may just digress for a minute, because this will bring you back to what you have raised.

"Mr. Williams, from what you have heard here, do you feel in any way that there would be a conflict as far as the public defender representing him?"

[Defendant] : "He is speaking to the other Mr. Williams."

[Father] : "I am sorry."

[Public Defender] : "Your Honor, at this time I couldn't say. I don't know what the grounds were, and I would have to examine our file. I couldn't advise the Court one way or the other at this time."

[Court] : "All right. I remember as to Count II it held there was insufficiency of the evidence. It was based on one of the recent cases. I believe it was Dorado. Yes, this is a Dorado case. That is the reason.

"Well, Mr. Williams, under the circumstances, if you want to be your own lawyer I will, of course, permit you to do that, and you will have to make arrangements for you to get some law books, and if you make up a list on paper what you want, why, we will start to get them to you the best we can, sir."

". . . . . . . . . ."

The second trial commenced and concluded in the month of August 1965 before a jury. The jury found the defendant guilty of assault with intent to murder his wife as charged in

count I of the information, and not guilty of the charge of assault with intent to murder Sharon Palmer, the wife's friend. The defendant was again sentenced to state prison.

A factual analysis of the case reveals the defendant married his wife, Noriko, in Japan in the year 1960. The marriage was a turbulent one, marred by multiple incidents depicting violent conduct on the part of the defendant towards his spouse, which may be succinctly stated as follows: on numerous occasions defendant pointed a gun at Noriko and threatened to kill her; at various times he hit and kicked her; he covered Noriko's face with a pillow so that she could not breathe; and he also cut her with a knife.

On the evening of April 3, 1963, Noriko and defendant had an argument. She departed from the house because of her fear of him, and stayed overnight at a friend's home. The following morning, Noriko called another friend, Sharon Palmer, and Sharon invited Noriko to be a guest in her home. Following Noriko's arrival, defendant appeared at Sharon's home at 9:30-10 a.m. He stood outside the locked screen door and was refused permission to talk to Noriko inasmuch as the latter had told Sharon that she did not want to speak with the defendant. Defendant left Noriko's purse with Sharon and departed. He returned to the Palmer residence repeatedly during the day. Noriko spoke to him during one of his early visits, and again at the time of his last visit. At the time of his fourth and final appearance, Noriko spoke to the defendant through the locked screen door. At the conclusion of the conversation, defendant shot his wife at a close range, hitting Noriko in the chest area just below the neck. Sharon Palmer heard the shot, looked through the door to the hallway, and then heard another blast. Sharon saw the defendant with the gun in his hand and observed two holes in the screen door and one in an interior wall. Defendant handed his gun to Sharon, who removed the shells from the chamber, and then called both the police and an ambulance. In the interim, defendant went back out to his parked car in the Palmer driveway and awaited the arrival of the authorities.

The officer who responded to the call arrived at the scene, was given the defendant's .22 caliber pistol by Sharon, together with six shells, of which two were spent and four were in normal condition. The officer then approached the defendant who immediately alighted from the car and yelled, "Don't shoot. It's all over with. I'm not going to give you any trouble," or "there is not going to be any more trou-

154

ble.'' The officer then arranged for the victim to be taken to the hospital by ambulance, where she was confined for a period of four to five days. The defendant was then arrested and taken into custody.

The defendant claims a reversal is justified for the following reasons: (1) insufficiency of the evidence; (2) denial of the right to counsel; (3) improper admission of the defendant's extrajudicial statements; and (4) the prior reversal of the judgment of conviction following the original trial, which reversal was based on the ground that defendant's constitutional rights under *Dorado* were violated, constitutes a bar to the subsequent prosecution.

Defendant initially urges that there was insufficient evidence depicting a specific intent to murder which is required to sustain a conviction under section 217 of the Penal Code. However, it is well-settled that the question whether the act is performed with any specific intent is a question of fact for determination by the trier of fact (*People* v. *Becerra*, 223 Cal.App.2d 448, 450 [35 Cal.Rptr. 808]; *People* v. *Weston*, 32 Cal.App. 571, 578 [163 P. 691]), and where there is any substantial evidence to support the trier's finding on that issue, such finding will not be disturbed on appeal. (*People* v. *Lyles*, 156 Cal.App.2d 482, 486 [319 P.2d 745]; *People* v. *Mainhurst*, 67 Cal.App.2d 882, 884-885 [155 P.2d 843].) The nature of the assault, especially the weapon used and the manner in which it was used, the actual consequences of the assault, including the nature, seriousness, and location of the wound, as well as consequences likely to follow, are among the circumstances that may support a finding that the assault was made with intent to commit murder. (*People* v. *Logan*, 244 Cal.App.2d 795, 797 [53 Cal.Rptr. 549]; *People* v. *Becerra*, *supra*, 223 Cal.App.2d 448, 450.)

The evidence reveals that during the marriage defendant pointed a gun at the victim on many occasions, struck, kicked, and bit her on others, endeavored to suffocate her with a pillow, and cut her with a knife. On the evening preceding the shooting, defendant kicked the victim during the course of a violent argument, resulting in the infliction of body bruises. The following day, defendant shot the victim at a range of 6 feet, and the defendant was observed by an eyewitness with a gun in his hand. Under these facts, the jury was entirely justified in determining that the defendant fired the .22 caliber pistol with the intent to kill. (See *People* v. *Alexander*, 41 Cal.App.2d 275, 281-282 [106 P.2d 450].) The element

of intent in a criminal prosecution is rarely susceptible of direct proof and usually must be inferred from all the facts and circumstances disclosed by the evidence and, where the evidence is sufficient to justify a reasonable inference that intent exists, a verdict will not be disturbed for failure to establish intent. (*People* v. *Kuykendall,* 134 Cal.App.2d 642, 645 [285 P.2d 996].)

Defendant next charges that the court erred in insisting that he accept the public defender to represent him and thereby denied him the right to counsel.

■ A defendant not only has the right to counsel, but also the right to represent himself, and generally the court cannot force a mentally competent defendant to be represented by an attorney. (Cal. Const., art. I, § 13; *People* v. *Crovedi,* 65 Cal.2d 199, 207 [53 Cal.Rptr. 284, 417 P.2d 868]; *People* v. *Harmon,* 54 Cal.2d 9, 15 [4 Cal.Rptr. 161, 351 P.2d 329], overruled on another point in *In re Estrada,* 63 Cal.2d 740, 742 [48 Cal.Rptr. 172, 408 P.2d 948]; *People* v. *Mattson,* 51 Cal.2d 777, 788-789 [336 P.2d 937].) ■ A defendant may waive his right to counsel either expressly (*People* v. *Ryan,* 118 Cal.App.2d 144, 146 [257 P.2d 474]) or impliedly. (*People* v. *Deveny,* 112 Cal.App.2d 767, 770-771 [247 P.2d 128].) The determination of whether defendant intelligently waived his right to counsel depends upon the facts of the particular case. (*In re Johnson,* 62 Cal.2d 325, 335 [42 Cal. Rptr. 228, 398 P.2d 420].) Whether a waiver of the right to counsel is intelligent is ordinarily a matter for the trial court's determination, and such determination will not be disturbed on appeal unless an abuse of discretion is shown. (*People* v. *Shroyer,* 203 Cal.App.2d 478, 483 [21 Cal.Rptr. 460].) In the case under review, the trial court caused a minute order to be entered to the effect that the defendant waived his right to counsel on June 18, 1965. ■ However, before the trial court may accept a waiver of counsel from defendant, it is duty bound to determine the defendant's competency to represent himself. (*People* v. *Carter,* 66 Cal.2d 666, 672 [58 Cal. Rptr. 614, 427 P.2d 214]; *In re Johnson, supra,* 62 Cal.2d 325, 335-337.)

■ It further appears clear that a superior court, in the absence of an effective waiver of the right to counsel, must appoint private counsel for an indigent defendant where the public defender is disqualified to represent the defendant because of a conflict of interest, providing the ground for dis-

qualification is of a substantive nature. (See Pen. Code, § 987a.)

In the case before us, the court did not comply with its obligation in determining whether the defendant was competent to represent himself in compliance with doctrines recently enunciated by the California Supreme Court. (*People v. Carter, supra,* 66 Cal.2d 666, 672; *In re Johnson, supra,* 62 Cal.2d 325, 335-337.) The trial court's finding that the defendant waived counsel therefore lacked validity inasmuch as the court did not first determine that the defendant understood " 'the nature of the charge, the elements of the offense, the pleas and defenses which may be available, or the punishment which may be exacted.' " (*In re James,* 38 Cal.2d 302, 313 [240 P.2d 596].) Nor is the foregoing rule necessarily inapplicable by reason of the fact that the defendant had previously been tried for the same offense. It is further clear that the court was unaware that the public defender was disqualified from representation of the defendant upon the retrial by virtue of a serious dispute which existed between the defendant and such agency relative to the conduct of the initial trial. The defendant referred to his first trial in objecting to the appointment of the public defender to represent him upon the retrial. While the court did make an inquiry of the public defender who was then present in court as to whether his office was disqualified from representing the defendant upon retrial, the public defender was unable to furnish the court with any definite information concerning the possible disqualification. One to two days' continuance would have obviously resolved any uncertainty as to whether the public defender would be in a position to represent the defendant, and would certainly have revealed the fact that the public defender had been previously relieved from representation in connection with the appeal of the judgment relating to the first conviction. The court would then have been in a position to offer private counsel to the defendant, and if he refused a private attorney, to apprise him of the consequences of self-representation. It is manifest, also, that neither defendant nor his father had any money, notwithstanding the defendant's statement that he might attain finances in the event he was released on his own recognizance. Defendant remained in custody and appeared for trial without counsel. Thus, the record reflects that the court did commit reversible error in finding that the defendant knowingly and intelligently waived his right to counsel.

Defendant contends that it was error to admit the statements that he volunteered to the officer when the officer first approached him immediately following the shooting incident; he urges that at the time he made the declaration, he had not yet been informed or advised of his constitutional rights. Under the doctrine enunciated in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], cert. den. 381 U.S. 937 [14 Ed.2d 702, 85 S.Ct. 1765], 381 U.S. 946 [14 L.Ed. 710, 85 S.Ct. 1792], the warnings required by *Dorado* were available to the defendant in this case. (See *People* v. *Rollins,* 65 Cal.2d 681 [57 Cal.Rptr. 293, 423 P.2d 221]; *People* v. *Williams, supra,* 233 Cal.App.2d 520, 521-522.) ▮ However, before *Dorado* is applicable, the investigation of the crime must have focused on the defendant; the defendant must be in custody; and there must be a process of interrogation designed to elicit incriminating statements. (*People* v. *Dorado, supra*; *People* v. *Williams, supra.*) Defendant's statement to the officer in the case under review constituted a spontaneous declaration, made prior to arrest, as the officer approached the defendant at the scene of the shooting, and the declaration was not the product of any process of interrogation designed to elicit incriminating statements. ▮ Where an officer arrives at the scene of a crime and the defendant voluntarily makes statements to the officer before being taken into custody, which are not the result of a process of interrogation, such statements are properly admitted in evidence. (*People* v. *Sanchez,* 65 Cal.2d 814, 822-823 [56 Cal.Rptr. 648, 423 P.2d 800].)

Defendant finally advances the novel proposal that he should not have been subjected to a retrial because there was a reversal of his first conviction on the basis of a constitutional violation, to wit, *People* v. *Dorado, supra,* 62 Cal.2d 338. In the prior decision, the exclusionary rule enunciated in *Dorado* required a reversal of defendant's conviction because certain statements made by him, after he was taken into custody, were admitted in evidence in violation of the *Dorado* exclusionary principle. (See *People* v. *Williams, supra,* 233 Cal.App.2d 520, 521.) ▮ However, a reversal of a conviction based upon a constitutional error in the admission of evidence does not preclude a retrial. If there is sufficient independent evidence to convict the defendant, the tainted evidence is not permitted to be introduced, and following a reversal, the matter is merely remanded for a new trial with directions to the trial court to exclude the evidence obtained in violation of the constitutional right. (See *People* v. *Dorado,*

*supra,* 62 Cal.2d 338; *People* v. *Treloar,* 64 Cal.2d 141 [49 Cal.Rptr. 100, 410 P.2d 620].) Upon the retrial herein, no incriminating statements resulting from a process of interrogation were admitted in evidence. Rather, only the defendant's spontaneous declarations were received in evidence, and these declarations were definitely admissible.

The judgment of conviction is reversed.

McCabe, P. J., and Tamura, J., concurred.